Philip **AGEE**

v.

**Edmund S. MUSKIE, Secretary of State, Appellant.**

**No. 80–1125.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 14, 1980.

Decided June 27, 1980.

As Amended Aug. 5, 1980.

Michael F. Hertz, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Leonard Schaitman, Mark H. Gallant and Douglas N. Letter, Attys., Dept. of Justice, and Roberts B. Owen, Dept. of State, Washington, D. C., were on brief for appellant.

Melvin L. Wulf, New York City, and Charles S. Sims, for appellee.

Before MacKINNON, ROBB and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

Dissenting opinion filed by Circuit Judge MacKINNON.

ROBB, Circuit Judge:

In this case Philip Agee challenges a regulation relied on by the United States Department of State to revoke his passport. The District Court, 483 F.Supp. 729, declared the regulation invalid for lack of congressional authorization and restored the passport. We affirm.

Appellee Philip Agee, a United States citizen and a former employee of the Central Intelligence Agency (CIA), presently resides in Hamburg, West Germany. Agee is a leading critic of the CIA's clandestine operations throughout the world. He has written and spoken extensively attacking American intelligence efforts, and has purportedly revealed the identities of certain undercover CIA agents. Agee was issued a United States passport, No. Z3007741, on March 30, 1978, with an expiration date of March 29, 1983. However, the United States Department of State, aware of Agee's activities and perhaps believing that they took on special significance because of the Iranian crisis [1] and the recent unrest in other Islamic countries, moved to revoke his passport.

On December 23, 1979 the United States Consul General in Hamburg delivered to Agee a letter from the Department of State notifying him that his passport was immediately revoked and should be surrendered. The letter invoked the authority of 22 C.F.R. §§ 51.70(b)(4) & 51.71(a) (1979). 22 C.F.R. § 51.70(b)(4) (1979) provides:

A passport may be refused in any case in which:

---

1. An article in the *New York Post* on December 17, 1979 reported that Agee would be invited to visit Iran and serve on an "international tribunal" created by Ayatollah Khomeini to pass judgment on the prisoners held in the American Embassy in Tehran. Agee denied being "invit-

ed to Iran by its government, The Revolutionary Council, or any representative thereof . . ." (J.A. 98), but resolution of this factual dispute is irrelevant to our decision. *See* note 3 *infra*.

The Secretary determines that the national's activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States . . . .

22 C.F.R. § 51.71(a) (1979) states:

A passport may be revoked, restricted or limited where:

The national would not be entitled to issuance of a new passport under § 51.70 . . . . .

According to the State Department letter

The Department's action is predicated upon a determination made by the Secretary under the provisions of Section 51.70(b)(4) that your activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States. The reasons for the Secretary's determination are, in summary, as follows: Since the early 1970's it has been your stated intention to conduct a continuous campaign to disrupt the intelligence operations of the United States. In carrying out that campaign you have travelled in various countries (including, among others, Mexico, the United Kingdom, Denmark, Jamaica, Cuba, and Germany), and your activities in those countries have caused serious damage to the national security and foreign policy of the United States. Your stated intention to continue such activities threatens additional damage of the same kind.

(J.A. at 13). The letter also informed Agee of his right to administrative review, and the Department of State subsequently offered him a hearing on an expedited basis. Agee rejected this option, however, and on December 31, 1979, he sued Cyrus Vance, who was then Secretary of State, in the District Court. The complaint sought declaratory and injunctive relief.

Agee's complaint challenged the revocation of his passport on five grounds: (1) that 22 C.F.R. § 51.70(b)(4) has not been authorized by Congress and is therefore invalid; (2) that 22 C.F.R. § 51.70(b)(4) is impermissibly vague and overbroad; (3) that the revocation of his passport prior to a hearing violated his Fifth Amendment right to procedural due process; (4) that the revocation of his passport violated his right to travel—a liberty interest protected by the Fifth Amendment; and (5) that his passport was revoked in order to punish him and suppress his criticism of government policy in violation of the First Amendment. In proceedings before the District Court on January 3, 1980, Agee's counsel, for the purposes of attacking the Secretary's authority to adopt and apply 22 C.F.R. § 51.70(b)(4), conceded the truth of "the charges as they are made in the letter to Agee." (Tr. at 16). On January 18, 1980 the case was orally argued to the District Court on cross-motions for summary judgment.

By Memorandum and Order dated January 28, 1980 the District Court granted summary judgment to Agee and ordered the restoration of his passport. The District Court concluded that "[t]he Secretary of State's power to revoke or limit a passport flows from Congress not from the President" and "[h]is power is no greater than Congress may choose to delegate to him." Accordingly the court held that 22 C.F.R. § 51.70(b)(4) is invalid because "the Secretary's promulgation of the challenged regulation was without [express or implied] authorization from Congress." On January 29, 1980 the Secretary of State filed a notice of appeal from the District Court's decision, and by Orders dated February 4 and 5, 1980 this court granted the Secretary's motion for a stay pending appeal.

As authority to promulgate and enforce 22 C.F.R. § 51.70(b)(4), the Secretary of State relies on the Passport Act of 1926, 22 U.S.C. § 211a (1976), which at the time the regulation was adopted in 1968 provided that:

The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic representatives of the United States, and by such consul generals, consuls, or vice consuls when in charge, as the Secretary of State may designate and by the chief or other executive officer of the insular possessions of

the United States, under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other persons shall grant, issue, or verify such passports.[2]

In *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Secretary of State had denied two passport applications pursuant to a regulation promulgated in reliance on 22 U.S.C. § 211a. The regulation prohibited the issuance of passports to members of the Communist Party or to persons who "engage in activities which support the Communist movement" or "are going abroad to engage in activities which will advance the Communist movement for the purpose, knowingly and wilfully of advancing that movement." *Id.* at 117–18 n.1, 78 S.Ct. at 1114 n.1. The Supreme Court held that "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment," and, therefore, "[i]f that 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress." *Id.* at 125, 129, 78 S.Ct. at 1118, 1120. Further, the Court stated that it would "construe narrowly all delegated powers that curtail or dilute [the right to travel]." *Id.* at 129, 78 S.Ct. at 1120. The Court held that Congress did not give the Secretary of State "unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose", and that the only grounds for refusing a passport "which it could fairly be argued were adopted by Congress in light of prior administrative practice" were "relate[d] to citizenship or allegiance on the one hand or to criminal or unlawful conduct on the other." *Id.* at 127-128, 78 S.Ct. at 1119. The Court explained that:

The difficulty is that while the power of the Secretary of State over the issuance of passports is expressed in broad terms, it was apparently long exercised quite narrowly. So far as material here, the cases of refusal of passports generally fell into two categories. First, questions pertinent to the citizenship of the applicant and his allegiance to the United States had to be resolved by the Secretary, for the command of Congress was that "No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States." 32 Stat. 386, 22 U.S.C. § 212. Second, was the question whether the applicant was participating in illegal conduct, trying to escape the toils of the law, promoting passport frauds, or otherwise engaging in conduct which would violate the laws of the United States.

*Id.* at 127, 78 S.Ct. at 1119. Thus, the Court, observing that the State Department rulings concerning Communists were "scattered" and "not consistently of one pattern", concluded that the regulation employed to deny passports to members and supporters of the Communist Party lacked congressional authorization and was therefore invalid. *Id.* at 128–30, 78 S.Ct. at 1119–1120.

In *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the Supreme Court considered the validity of an area travel ban imposed by the Secretary of State to prohibit travel to Cuba by all United States citizens. The Court reasoned that the language of 22 U.S.C. § 211a "is surely broad enough to authorize area restrictions, and there is no legislative history indicating an intent to exclude such restrictions from

**2.** Section 211a was amended in 1978 by the addition of the following language:

Unless authorized by law, a passport may not be designated as restricted for travel to or for use in any country other than a country with which the United States is at war, where armed hostilities are in progress, or where there is imminent danger to the public health or the physical safety of United States travellers.

22 U.S.C. § 211a (Supp. II 1978).

By Executive Order No. 11295 (August 5, 1966), 31 Fed.Reg. 10603, the Secretary of State was "designated and empowered to exercise, without the approval, ratification, or other action of the President, the authority conferred upon the President by the first section of the Act of July 3, 1926 (22 U.S.C. 211a), to designate and prescribe for and on behalf of the United States rules governing the granting, issuing, and verifying of passports."

the grant of authority." *Id.* at 8, 85 S.Ct. at 1276. Noting that area restrictions were imposed on numerous occasions both before and after the Passport Act was adopted in 1926, the Court held that the ban on travel to Cuba was valid because there was "an administrative practice sufficiently substantial and consistent to warrant the conclusion that Congress had implicitly approved it." *Id.* at 8–12, 85 S.Ct. at 1279. In addition, the Court stated that, unlike the denial of the passport applications in *Kent v. Dulles, supra,* "the Secretary has refused to validate appellant's passport not because of any characteristic peculiar to appellant [i. e., political beliefs or associations], but rather because of foreign policy considerations affecting all citizens." *Id.* at 13,[3] 85 S.Ct. at 1279.

This court has also considered the issue of congressional authorization for administrative actions impacting on the right of international travel. In *Woodward v. Rogers,* 344 F.Supp. 974 (D.D.C.1972), *aff'd without opinion,* 159 U.S.App.D.C. 57, 486 F.2d 1317 (1973), this court summarily affirmed the District Court's holding that there existed neither explicit nor implicit statutory authority for requiring an oath of allegiance as a prerequisite to the issuance of a passport. The District Court said:

> While an Oath of Allegiance may, indeed, have been included on the passport

---

3. The dissent emphasizes this reference in *Zemel v. Rusk* to "foreign policy considerations", as well as the Supreme Court's statement that "the restriction which is challenged in this case is supported by the weightiest considerations of national security [as] is perhaps best pointed up by recalling that the Cuban missile crisis of October 1962 preceded the filing of appellant's complaint by less than two months." 381 U.S. at 13, 16, 85 S.Ct. at 1280. The dissent suggests that *Zemel v. Rusk* upholds passport revocations on foreign policy and national security grounds in the broad sense of those terms. In our view, however, *Zemel v. Rusk* holds only that, in light of the extensive history of executive imposition of area restrictions on travel, such restrictions are valid because they have received congressional authorization. *See id.* at 8–12, 85 S.Ct. at 1276–1278. The heart of the *Zemel* opinion is the Supreme Court's statement that "[t]his case is therefore not like *Kent v. Dulles, supra,* where we were unable to find . . . an administrative practice sufficiently substantial and consistent to warrant the conclusion that Congress had implicitly approved it." 381 U.S. at 12, 85 S.Ct. at 1279. Although the Secretary's 1961 ban on travel to Cuba assuredly involved foreign policy and national security considerations, so too did the Secretary's denial of passports to Communist party members and sympathizers pursuant to 22 C.F.R. § 51.135, which was struck down in *Kent v. Dulles.* Rather than broadly validating passport revocations on foreign policy and national security grounds, *Zemel v. Rusk* merely sustained one means of satisfying those concerns—the imposition of area restrictions—because it had been "implicitly approved" by Congress.

The dissent also notes the Supreme Court's citation in the *Zemel* opinion of 22 U.S.C. § 1732, which directs the President to "use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release" of "any citizen of the United States [who] has been unjustly deprived of his liberty by or under the authority of any foreign government." The *Zemel* Court stated:

> It also cannot be forgotten that in the early days of the Castro regime, United States citizens were arrested and imprisoned without charges. We think, particularly in view of the President's statutory obligation [under 22 U.S.C. § 1732], that the Secretary has justifiably concluded that travel to Cuba by American citizens might involve the Nation in dangerous international incidents, and that the Constitution does not require him to validate passports for such travel.

381 U.S. at 15, 85 S.Ct. at 1280. The dissent argues that 22 U.S.C. § 1732 authorized the revocation of Agee's passport as part of the President's efforts to free the Americans held hostage in Iran. However, in revoking Agee's passport, the Secretary did not rely on 22 U.S.C. § 1732 and, in fact, made no mention whatsoever of the Iranian crisis. According to the letter that Agee received from the Department of State, the Secretary relied only on 22 C.F.R. §§ 51.70(b)(4) & 51.71(a) as authority for his action, and the sole reasons offered for his decision were that:

> Since the early 1970's it has been your stated intention to conduct a continuous campaign to disrupt the intelligence operations of the United States. In carrying out that campaign you have travelled in various countries (including, among others, Mexico, the United Kingdom, Denmark, Jamaica, Cuba, and Germany), and your activities in those countries have caused serious damage to the national security and foreign policy of the United States. Your stated intention to continue such activities threatens additional damage of the same kind.

(J.A. at 13). Thus, 22 U.S.C. § 1732 is not germane to this case.

application for an extended period, travel abroad until recently was not conditioned upon the possession of a passport, with the exception of limited periods of international hostilities or national emergency. Moreover, there has been no evidence introduced establishing an open and highly published practice of denying applicants passports for simply refusing to swear to or affirm the Oath. Under these circumstances, this Court is extremely reluctant to conclude that Congress, in re-enacting the passport legislation in 1952, indicated a clear intention to authorize the Secretary of State to establish the Oath requirement as a prerequisite to the exercise of a citizen's constitutionally protected right to travel. Indeed, the Supreme Court has made it plain that only the clearest of such evidence will permit this Court to consider Congressional silence to be a substitute for explicit and affirmative legislative action in limiting the free exercise of important rights.

344 F.Supp. at 985. In *Lynd v. Rusk*, 128 U.S.App.D.C. 399, 389 F.2d 940 (1967), this court held that the Secretary of State could not withhold a citizen's passport for failure to give assurance that he would not travel without a passport to those countries where the Secretary had designated travel to be inimical to the nation's foreign policy. The court reasoned that "[a]lthough Congress has approved administrative action intended to limit travel to restricted areas through the means of restricting passports, . . . it has not made travel to restricted areas a crime and added possible deprivation of liberty as a sanction for achieving this objective"; and thus the court concluded that there was no "basis for inferring that Congress has given the Secretary the authority to deny legitimate, constitutionally protected travel, merely because that is a

technique which provides greater assurance of hindering travel to designated areas." 128 U.S.App.D.C. at 405, 389 F.2d at 946–947.

In summary, as the case law makes clear, the Secretary of State must demonstrate that Congress has authorized 22 C.F.R. § 51.70(b)(4) either by an express delegation or by a "sufficiently substantial and consistent" administrative practice to warrant finding the implied approval of Congress.

The Secretary argues that the Passport Act of 1926, 22 U.S.C. § 211a, interpreted consistently with the President's power to protect national security and conduct foreign affairs, authorizes the revocation of Agee's passport under 22 C.F.R. § 51.70(b)(4), especially in light of Agee's concession for purposes of his summary judgment motion that his activities seriously damage the national security and the foreign policy of the United States. However, the Passport Act does not expressly authorize the Secretary to deny or revoke a passport on national security or foreign policy grounds, and no subsequent legislation relating to passports has explicitly delegated such authority. In fact, in 1958 and in 1966 the Department of State unsuccessfully sought this precise power from Congress,[4] and in 1978 Congress limited the Secretary's discretion, as upheld in *Zemel v. Rusk, supra*, to impose area restrictions on travel.[5] To be sure the failure to enact the legislation sought by the Department of State and the contraction of executive power over area restrictions do not conclusively signify congressional disapproval of 22 C.F.R. § 51.70(b)(4); but neither do they support the Secretary's construction of 22 U.S.C. § 211a as a broad delegation of authority to regulate. Moreover, with regard to the inherent foreign affairs power of the executive, the

4. S. 4110, 85th Cong., 2d Sess. (1958), introduced by Senator Green at the request of the Secretary of State, would have permitted the denial of passports to persons whose activities or presence abroad would "seriously impair the conduct of the foreign relations of the United States" or would "be inimical to the security of the United States." H.R. 14895, 89th Cong., 2d Sess. (1966), introduced by Representative

Hays, would have sanctioned the refusal or revocation of a passport if "the Secretary determines that the applicant's activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States." Both these bills died in committee and were never brought to a vote.

5. *See* note 2 *supra*.

Supreme Court emphasized in *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962), that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance", and we reaffirm what this court stated in *Lynd v. Rusk, supra* :

> [I]n the cases before us the Secretary does not press any claim that he has an "inherent" authority, and contends his action is valid under the Passport Act of 1926. It is not insignificant that the *Zemel* opinion, supporting the Secretary, did not rely on an inherent authority. We think any claim of inherent authority would fall afoul of the Supreme Court's warning in *Kent v. Dulles*, 357 U.S. 116, at 129 [78 S.Ct. at 1119] [2 L.Ed.2d 1204] (1958), that as freedom to travel is part of the "liberty" protected by the Fifth Amendment, "if that 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress."

128 U.S.App.D.C. at 403, 389 F.2d at 944.

The Secretary contends that past administrative and legislative practice also confirms congressional approval of his authority to deny or revoke passports on the basis of "serious damage to the national security or the foreign policy of the United States." However, the Secretary details only one instance in twelve years in which 22 C.F.R. § 51.70(b)(4) was employed to revoke a passport,[6] and only five refusals of passport applications, two prior to the passage of the Passport Act of 1926 and three during the mid-1950's, which were even arguably for national security or foreign policy reasons.[7] Regardless of whether Congress was aware of these scattered examples when it adopted the Passport Act in 1926 and other travel control legislation in 1941, 1952, and 1978, such evidence hardly amounts to a "substantial and consistent administrative practice" demonstrating implied congressional authorization for the challenged regulation. Until Agee's case arose. 22 C.F.R. § 51.70(b)(4)) was virtually unused.

In addition, the Secretary relies on a series of statutes, regulations, proclamations, orders and advisory opinions dating back to 1856, most of which concern the power of the executive to refuse passports to persons engaged in criminal conduct and to restrict or condition the issuance of passports during time of war or national emergency;[8]

---

**6.** In 1970 the passports of Charles McKissack, attorney for Mrs. Mary Sirhan, and his assistant were revoked pursuant to 22 C.F.R. § 51.70(b)(4) as they were preparing to leave the United States, and they were unsuccessful in their attempts to enjoin the revocations. (Br. for Appellant at 46).

**7.** In 1906 a passport was denied to an American citizen who had traveled to China and became notorious as a promoter of gambling and prostitution. In 1907 a passport was denied to Nelken Waldberg, an American citizen living in Cairo, who "was engaged . . . in blackmailing projects, and was disturbing, or endeavoring to disturb, the relations of this country with the representatives of foreign countries." *Id.* at 37–38.

Colonel Hubert Julian, whose activities included supplying arms to various countries, was denied a passport in 1954. In 1955 two passport applications were refused because the applicants' participation in political affairs abroad had become an internal problem to the foreign governments involved. *Id.* at 46; (Rep.Br. for Appellant at 17 & n.15). In addition, the Secretary notes that the statistics provided to the Senate Foreign Relations Committee during hearings in 1957 showed that, apart from numerous "passport refusals for security reasons" that were related to 22 C.F.R. § 51.135, the Communist regulation held invalid in *Kent v. Dulles*, twenty-one passport applications in 1955 and ten passport applications in 1956 were refused because the applicants were "participants in political affairs abroad whose activities were deemed harmful to good relations and persons whose previous conduct abroad has been such as to bring discredit on the United States and cause difficulty for other Americans (gave bad checks, left unpaid debts, had difficulty with police, etc.)." (Br. for Appellant at 44); *Department of State Passport Policies, Hearings before the Senate Committee on Foreign Relations*, 85th Cong., 1st Sess. 38–40 (1957).

The rationale for these passport denials, however, appears only tenuously related to 22 C.F.R. § 51.70(b)(4)'s concern with "serious damage to the national security or the foreign policy of the United States."

**8.** *See, e. g.,* Pub.L.No.65–154, 40 Stat. 559 (1918); Pub.L.No.77–114, 55 Stat. 252 (1941); Pub.L.No.82–414, 66 Stat. 190 (1952); Pub.L. No.95–426, 92 Stat. 971 (1978); 23 Op.Atty. Gen. 509, 511 (1901); Proclamation No. 1473, 40 Stat. 1829 (1918); 17 Fed.Reg. 8013 (1952).

but such measures are inapposite and unpersuasive on the issue of implicit authority to invoke national security or foreign policy considerations during peacetime. *See Kent v. Dulles, supra,* 357 U.S. at 128, 78 S.Ct. at 1119. Further, as illustrated by the Supreme Court's decisions in *Kent v. Dulles, supra* at 127, 78 S.Ct. at 1118, and *Zemel v. Rusk, supra* 381 U.S. at 8, 85 S.Ct. at 1276, the criterion for establishing congressional assent by inaction is the actual imposition of sanctions and not the mere assertion of power. "[O]nly the clearest . . . evidence [of past administrative and legislative practice] will permit this Court to consider Congressional silence to be a substitute for explicit and affirmative legislative action in limiting the free exercise of important rights." *Woodward v. Rogers,* 344 F.Supp. at 985. Such proof is lacking here.

 We conclude that 22 C.F.R. § 51.70(b)(4) was promulgated by the Secretary of State and enforced against Agee without the requisite express or implied authorization of Congress.[9] The Secretary may not revoke Agee's passport unless Congress has authorized him to do so, for "the right to travel abroad" is constitutionally protected and subject to regulation only "pursuant to the law-making functions of the Congress." *See Aptheker v. Secretary of State,* 378 U.S. 500, 505, 84 S.Ct. 1659, 1663, 12 L.Ed.2d 992 (1964); *Kent v. Dulles, supra* 357 U.S. at 129, 78 S.Ct. at 1119.

 The decisions of the Supreme Court would permit the revocation of Agee's passport if he were indicted or otherwise

charged with criminal conduct,[10] but he has not been charged with any violation of law. The State Department's letter revoking his passport makes no such charge. Under the decisions it is not enough, absent a formal allegation of criminal activity, that Agee's conduct may be considered by some to border on treason. We are bound by the law as we find it.

The judgment of the District Court declaring 22 C.F.R. § 51.70(b)(4) invalid and ordering the restoration of Agee's passport is affirmed, and the stay pending appeal is vacated.

*So ordered.*

MacKINNON, Circuit Judge (dissenting).

The issue for determination is whether regulations of the Department of State, under which the Secretary of State revoked the passport of Philip Agee, are unconstitutional on their face and as applied. Agee, a former agent of the Central Intelligence Agency (CIA), concedes in this case that his international travel activities "have caused serious damage to the national security and foreign policy of the United States" and that his "stated intention to continue such activities threatens additional damage of the same kind." (App. 9, 29) The District Court held that while such grounds may be adequate to support a passport revocation during an emergency, they are not adequate in "peace-time." (App. 51) This overlooks the significance of the enactment by Congress in 1978 which extended the

---

9. Because we so hold, we need not consider Agee's constitutional attacks on the regulation and its application to him based on the First and Fifth Amendments.

10. *See Kent v. Dulles, supra,* 357 U.S. at 127–28, 78 S.Ct. at 1118–1119. 22 C.F.R. § 51.70(a)(1) (1979) provides for the denial or revocation of a passport if "[t]he applicant is the subject of an outstanding Federal warrant of arrest for a felony, including a warrant issued under the Federal Fugitive Felon Act (18 U.S.C. 1073) . . . ."

In *Snepp v. United States,* 444 U.S. 507, 517 & n.3, 100 S.Ct. 763, 769, & n.3, 62 L.Ed.2d 704 (1980), Mr. Justice Stevens observed in his dissent that "Congress has enacted a number of criminal statutes pun-

ishing the unauthorized dissemination of certain types of classified information" including "18 U.S.C. § 798, which imposes a prison term of 10 years and a $10,000 fine for knowingly and wilfully publishing certain types of classified information" and "18 U.S.C. § 794, which makes it a criminal offense punishable by life in prison to communicate national defense information to a foreign government." The Secretary, in fact, acknowledges that Agee may be in violation of 18 U.S.C. § 793 because he "has 'communicated' 'to persons not entitled to receive it' 'information relating to the national defense' which could be 'used to the injury of the United States.' " (Br. for Appellant at 23 n.8).

requirement for passports in emergencies into the peace-time era. It also does not give adequate recognition to the powers of the Executive under the Hostage Act and implicit adoption by Congress in 1978 of prior administrative practice in passport revocations. For this and for other reasons which are demonstrated hereafter, the Secretary of State on the record in this declaratory judgment action is authorized to revoke Agee's passport. It is an unreasonable interpretation of congressional intent to hold that a passport cannot be revoked for one with Agee's propensities to cause serious damage to this nation. No United States Congress would ever intend to require a President to issue a passport to one with Agree's record and intentions. If the decision of the District Court is not to be reversed the least that should be done would be to vacate and remand for the hearings that were never held.

## I.

## FACTS

A. *Agee's Background—Past Activities.*

Agee is an American citizen who is presently residing in Hamburg, West Germany after having previously been deported from Great Britain, (danger to national security), France, Germany and Holland (endanger Holland). (App. 92); P. Agee, L. Wolf, *Dirty Work : CIA in Western Europe* 286–300 (1978).

When Agee first entered on duty with the CIA as an agent on July 22, 1957, he executed a formal "Secrecy Agreement" with the Agency which included the following undertaking:

[I]n consideration of my employment by CIA I undertake not to publish or to participate in the publication of any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of my employment by the Agency

without specific prior approval by the Agency.[1]
(App. 65)

Thereafter, in reliance on Agee's execution of the Secrecy Agreement, the CIA assigned him to highly confidential duties in a trust relationship with the agency. He was given training in CIA clandestine operations, and allowed to enter CIA headquarters where he became personally acquainted with numerous CIA employees who had undercover assignments, many of whom are still active. Agee also was assigned to serve in undercover assignments abroad. (App. 56–57) He worked in numerous positions of trust in the CIA including one with the Directorate of Operations, and he was permitted to acquire a detailed knowledge of the secret methodology used by the agency to provide cover for its undercover employees and cooperating sources. (App. 57)

As a consequence of personal problems that threatened to expose his CIA affiliation in an undercover position, Agee resigned in November of 1968. (App. 57) In November, 1971 the CIA received its first indication that Agee had embarked on a program to expose CIA intelligence activities when a publication in Uruguay published a letter, purportedly written by Mr. Agee, in which the CIA was accused of interference in upcoming Uruguayan elections.

Subsequently, on October 3, 1974 Agee issued a press release in London as follows:

Today, I announced a new campaign to fight the United States CIA wherever it is operating. This campaign will have two main functions: First, to expose CIA officers and agents and to take the measures necessary to drive them out of the countries where they are operating; secondly, to seek within the United States to have the CIA abolished.

This effort to identify CIA people in foreign countries has been going on for some time . . .. (Today's) list was compiled by a small group of Mexican

---

1. The validity of such Agreement was upheld by the Supreme Court in *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam), rehearing denied, April 14, 1980.

comrades whom I trained to follow the comings and goings of CIA people before I left Mexico City.

Similar lists of CIA people in other countries are already being compiled and will be announced when appropriate. We invite participation in this campaign from all those who strive for social justice and national dignity.

(App. 58)

Following that announcement Agee continued to engage in a world-wide program designed to expose CIA activities and personnel. In doing so he resorted to publications, personal appearances and press conferences throughout the world, including London, Sweden, Denmark, Jamaica, and Cuba. He was quoted or interviewed on the same subject in newspapers or by the television media in Portugal (concerning CIA agents in Angola), Spain, Holland, Rome (concerning CIA activities in Switzerland), Bolivia, Australia and New Zealand. (App. 58–61) At the time of these disclosures Agee allegedly admitted some of them and some were credited to him by the publishers or writers without his confirmation. When the CIA's Athens Chief, Richard Welch, was murdered by Greek Terrorists in December, 1975 some CIA officials reportedly blamed Agee's activities in part. (App. 92)

In 1978, Agee participated in the publication of a book entitled, *Dirty Work: CIA in Western Europe* (1978). In the book's introduction Agee stated he intended, by participating in the publication, to create opposition to the CIA by publishing the identities of CIA employees. The book claims reliance on a number of "official publications" but also asserts "use of other, less public information from within several American embassies, and other sources as noted . . . " *Id.* at 319. The book contains an Appendix of 415 pages that purports to list and describe a large number of undercover CIA employees. (App. 61, 66–75) There is no record that Agee ever made a request to be released from the terms of his Secrecy Agreement. (App. 56) His right to write is recognized, but not his right to violate his Secrecy Agreement and disclose information vital to the national security of the United States.

B. *The Iranian Crisis.*

We may take judicial notice of the significant facts of the United States' involvement in the present Iranian Crisis. Fed.R. Evid. 201(b), (c), (f). Early in 1979 the Shah of Iran was forced to leave his country. The country soon passed into the hands of a self-styled Islamic Republic, which termed itself "Revolutionary." The person who became the principal figure in the government of the country was a prominent Moslem cleric, and there were a great many quick executions of persons who previously held top positions in the Shah's government. As frequently happens with revolutions, the government that replaced the Shah did not quickly reach maturity and dangerous unrest continues throughout the country, and, principally in the capital city, Tehran.

On November 4, 1979, a severe international crisis developed between the United States and a faction of militant insurgents in Iran who invaded the United States Embassy in Tehran, occupied the entire compound by force, seized over 50 United States citizens who were duly accredited as members of the official United States diplomatic mission to Iran, and confined them in the Embassy. These Iranian terrorists have continued to hold the members of the Embassy staff as hostages to their unlawful demand that the United States, with whom Iran has no extradition treaty, extradite Mohammad Reza Pahlavi, the Ex-Shah of Iran. The Ex-Shah, suffering from cancer and a bile duct obstruction had been *temporarily* admitted to the United States for a short period in November, 1979 for emergency surgery. The Ex-Shah has long since departed from the United States, and the United States has never acceded to the demand for his extradition to Iran. Nevertheless, the militant insurgents, voicing other nebulous complaints, continue to occupy the United States Embassy and by force and violence to hold captive therein the

official staff members of the United States Diplomatic Mission.

The United States took the matter to the International Court of Justice at the Hague where the above facts as alleged by the United States were not contradicted by Iran. That Court on December 15, 1979 was unanimous in issuing an Order which in significant part states:

> However important and however connected with the present case, the inequities attributed to the United States Government by the Government of Iran in that letter may appear to be to the latter Government, the seizure of the United States Embassy and consulates and the detention of internationally protected persons as hostages cannot, in the view of the court, be regarded as something "secondary" or "marginal," having regard to the importance of the legal principles involved. * * *

> There is no more fundamental prerequisite for the conduct of relations between states than the inviolability of diplomatic envoys and embassies, so that throughout history nations of all creeds and cultures have observed reciprocal obligations for that purpose.

United States Diplomatic and Consular Staff in Tehran, Provisional Measures, Order of 15 December 1979, I.C.J. Reports 1979, pp. 15, 19. On April 4, 1980, the President of the United States announced the severance of diplomatic relations with Iran because of Iran's refusal to release the hostages. On May 24, 1980 the World Court announced its *unanimous* decision declaring Iran to be in violation of international law in holding the hostages.

C. *Agee's Relation to the Hostage Crisis in Iran.*

With this situation existing on December 17, 1979 a newspaper article in the *New York Post* reported that Agee had been invited to travel to Iran in order to participate in a "Tribunal" to help judge the American hostages then being held in Tehran under the conditions described above. (App. 37) It is incorrect to state that the Secretary did not mention the Iranian crisis

as the record refers to the "damage . . found in the recent attacks on the United States [Embassy] . . . *in Iran* . . ." (App. 36) (Emphasis added).

Judicial notice is also taken of the generally known fact that following the overthrow of the Shah those who succeeded to power in Iran conducted so-called revolutionary "Tribunals" which involved many mass trials that almost invariably led to imposition of the death sentence and prompt execution. Fed.R.Evid. 201(b), (c), (f). While there was no assurance that such would be the result of the Iranian tribunal to which Mr. Agee was invited to attend, he made no prompt public denial of the invitation nor any statement with respect thereto. The Iranian government also professed an inability to guarantee the security of the hostages. This created the gravest concern in the United States for the safety of its citizens who comprised the Embassy staff members being held hostage. (App. 37)

In addition to the situation in Iran, recent attacks on United States embassies also occurred in other Islamic countries, Libya and Pakistan (App. 36), and the United States Ambassador to Columbia was held hostage during the same period by a band of militants in Bogota. The State Department expressed its judgment that the international situation was such that it was likely that other "United States diplomatic facilities, including embassies and consulates, would be taken over by force and that United States diplomats and other nationals would be physically harmed." (App. 37)

Given Agee's prior disclosures of United States' intelligence activities *throughout the world*, and some of the results that were outlined and detailed in the uncontroverted Government affidavit (App. 36–37), the State Department concluded that "Agee's activities have caused and are likely to cause serious damage to the national security and foreign policy of the United States." (App. 37–38) The United States allows its citizens more freedom of expression than any nation in the world, but our

Constitution and laws do not require that we assist illegal conduct that adheres to our enemies, causes serious damage to our national security, and endangers the lives of our citizens. The State Department was well advised to "mark him well." [2]

D. *The Passport Revocation.*

As the District Court describes the situation:

"The Department of State, aware of Agee's activities and believing that they took on particular significance in light of the *recent Iranian crisis* and the general unrest in *other areas*, moved to revoke his passport."

(App. 47) (Emphasis added). To revoke his passport, on December 23, 1979 the State Department sent the following letter by cable to the United States consulate in Hamburg, West Germany for delivery to Agee:

The Department of State has requested the Consulate to inform you that the Department has revoked Passport No. Z3007741 issued to you on March 30, 1978 under the provisions of Section 51.71(a) of Title 22, Code of Federal Regulations.

The Department's action is predicated upon a determination made by the Secretary under the provisions of Section 51.-70(b)(4) *that your activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States.* The reasons for the Secretary's determination are, in summary, as follows: Since the early 1970's it has been your stated intention to conduct a continuous campaign to disrupt the intelligence operations of the United States. In carrying out that campaign you have travelled in various countries (including, among others, Mexico, the United Kingdom, Denmark, Jamaica,

Cuba, and Germany); and your activities in those countries have caused serious damage to the national security and foreign policy of the United States. *Your stated intention to continue such activities threatens additional damage of the same kind.*

You are advised of your right to a hearing under Sections 51.80 through 51.-105 of the Regulations. A copy of the regulations is enclosed. If you should desire a hearing, you must notify the Consulate within sixty days after your receipt of this notice.

\* \* \* \* \* \*

You are also advised that the Consulate is prepared to receive, on an expedited basis, any evidence you may with to present on your behalf as to why your passport should be re-instated. This opportunity to present evidence is in addition to your right to a hearing pursuant to the Regulations and is designed to afford you the fullest possible due process.

(App. 13) (Emphasis added)

## II.

## THE INSTANT DECLARATORY JUDGMENT PROCEEDINGS

As indicated above, the State Department letter (App. 13) advised Agee of his right to a hearing on the revocation of his passport in accordance with the Passport Regulations, 22 C.F.R. §§ 51.80–51.105 [3] A copy of the regulations was enclosed. However, Agee elected not to exhaust his administrative remedies, even though he was advised that the Consulate was prepared on an expedited basis to receive any evidence he desired to present. (App. 13) So instead of appealing the revocation by the Secretary of State, on December 31, 1979 Agee elect-

---

**2.** Breathes there the man, with soul so dead,
 Who never to himself hath said,
 This is my own, my native land!
 Whose heart hath ne'er within him burned,
 As home his footsteps he hath turned,
 From wandering on a foreign strand!
 If such there breathe, go, mark him well . .
 [etc.]

The Lay of the Last Minstrel, Sir Walter Scott, Canto Sixth, I.

**3.** Such Regulations provide every conceivable procedural protection for citizens who are denied passports.

ed to file a complaint in the United States District Court for the District of Columbia against Cyrus Vance, Secretary of State, seeking declaratory and injunctive relief. He should have been required to exhaust his administrative remedy, *Robeson v. Dulles*, 235 F.2d 810 (D.C.Cir.), *cert. denied*, 352 U.S. 895, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956),[4] or failing that, to make a more adequate record in this case.

This complaint, which initiated the case presently before the Court, alleges that Agee suffered First and Fifth Amendment violations of his rights under the United States Constitution. It also alleges that Agee is a citizen of the United States residing in West Germany and holds a passport issued on March 30, 1978 to expire on March 29, 1983; that he is a well-known critic of the foreign policy of the United States and the clandestine activities of the Central Intelligence Agency; that on December 23, 1979 his passport was revoked, effective immediately, under the authority of 22 C.F.R. §§ 51.70(b)(4) and 51.71; and that

the relevant State Department regulations authorized revocation of passports when:

> (4) The Secretary determines that the national's activities abroad are causing or likely to cause serious damage to the national security or the foreign policy of the United States.

(App. 3); 22 C.F.R. § 51.70(b)(4).

The complaint charges that the revocation of Agee's passport was invalid and unlawful for five stated reasons and that such revocation caused him irreparable injury.[5] It prayed that the Court (a) declare 22 C.F.R. §§ 51.70(b)(4) and 51.71 invalid and unconstitutional on their face and as applied to Agee, and (b) withdraw the revocation and restore Agee's passport. (App. 4)

The matter came on for hearing in the District Court on January 3, 1980, at which hearing it was concluded that Agee would file a motion for summary judgment, to which the government would respond. In the course of the January 3rd hearing a colloquy occurred with the court in which

---

4. An unanimous *en banc* decision of this Court in *Robeson v. Dulles*, 235 F.2d 810 (D.C.Cir.), *cert. denied*, 352 U.S. 895, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956), held, in practically identical circumstances to the present case, that a passport applicant was required to exhaust his administrative remedies and, failing that, could not assert the invalidity of the regulation providing for one. *Cf. National Lawyer's Guild v. Brownell*, 225 F.2d 552 (D.C.Cir.), *cert. denied*, 351 U.S. 927, 76 S.Ct. 778, 100 L.Ed. 1457 (1956). The Court refused to assume the invalidity of a hearing that had not been held or the illegality of questions which had not been asked. The plaintiffs in both *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) and *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) did bring declaratory judgment actions but there was no indication that the Government objected to such procedure. At a minimum a hearing should have been held, if not before the Department of State then before the Court. If the prior administrative practice were held to be insufficient to support the regulation the case should be remanded for further hearing. Failing that, requires one to deal with the sketchy record. However, if the majority considers this record to be adequate, a dissent may point to deficiencies that indicate Agee has not sustained his burden of proving that the Department acted improperly in revoking his passport.

5. The complaint describes the five reasons and irreparable injury as follows:

> a. Revocation for the reasons set out in 22 C.F.R. § 51.70(b)(4) has not been authorized by Congress, and is therefore impermissible;
> b. 22 C.F.R. § 51.70(b)(4) is vague and overbroad, in violation of the First Amendment;
> c. In the circumstances of this case, revocation without prior notice and hearing violates the due process clause of the Fifth Amendment;
> d. Revocation deprives plaintiff of liberty without due process of law, in violation of the due process clause of the Fifth Amendment;
> e. Defendant revoked plaintiff's passport in order to penalize and suppress his criticism of the United States government's policies and practices, in violation of the First Amendment.

7. Revocation of plaintiff's passport has caused and will continue to cause him irreparable injury, including interference with his right to live abroad, his right to pursue his chosen occupation free from unreasonable governmental interference, his right to travel, his right to criticize the policies of the United States of America and of other nations, and his right to live with his family.

(App. 3–4)

.. 

Agee's counsel *conceded* on behalf of his client that Agee was *"causing or is likely to cause serious damage to the national security . . .",* (App. 16–17, 29–30), and *intended "to continue such activities".* (App. 34, 30) (Emphasis added) Agee had often expressed his intention to do just that.

The District Court filed its Memorandum and Order on January 28, 1980 granting Agee's motion for summary judgment and denying the cross-motion of the United States; its judgment was based primarily on a determination that the regulation was invalid. Other issues were not reached. The court stated: "[a]ll that is held here is that because Congress has not acted to grant the Secretary authority, the regulation in issue cannot be upheld." (App. 53)

In reaching this decision, the District Court claimed support primarily from *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) and *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), from which it concluded: "The Secretary of State's power to revoke or limit a passport flows from Congress not from the President . . . His power is no greater than Congress may choose to delegate to him." (App. 49) As applied to Agee's case, the District Court's decision held that Congress, in authorizing the President to promulgate passport regulations, did not authorize him by regulation to provide for the revocation of passports of citizens in "peacetime" who are causing or likely to cause serious damage to the "national security" or the "foreign policy" of the United States and intended to continue to cause such damage.

For reasons hereinafter set forth it is submitted that such conclusion misreads congressional intent and *Kent* and *Zemel* ;

that such decisions support a judgment here holding that the regulations authorizing the revocation of Agee's passport because of the serious damage he was causing and threatening to cause to our national security and foreign relations are constitutional; and that the revocation on such stated grounds was also constitutional.

### III.

### STATUTORY AUTHORITY FOR PASSPORT REVOCATION

The authority for the Secretary of State and consular officials to issue passports *"under such rules as the President shall designate and prescribe for and on behalf of the United States"* has existed since the first Passport Act was adopted on August 18, 1856, ch. 127, 11 Stat. 60–61. There have been minor amendments to the act but none changed the italicized wording set forth above granting the President the power to prescribe such rules.[6] The same grant of power continues to the present day in 22 U.S.C. § 211a:

§ 211a. The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic representatives of the United States, and by such consul generals, consuls, or vice consuls when in charge, as the Secretary of State may designate, and by the chief or other executive officer of the insular possessions of the United States, *under such rules as the President shall designate and prescribe for and on behalf of the United States,* and no other person shall grant, issue or verify such passports . . .[7]

6. Subsequent amendments include: Act of March 3, 1863, ch. 79, 12 Stat. 754; Act of May 30, 1866, ch. 102, 14 Stat. 54, R.S. § 4075; Act of June 14, 1902, ch. 1088, 32 Stat. 386; Act of June 4, 1920, ch. 223, 41 Stat. 750–51.

7. The "Foreign Relations Authorization Act, Fiscal Year 1979," approved October 7, 1978, added a sentence limiting the area restrictions that might be placed on passports.

"Unless authorized by law, a passport may not be designated as restricted for travel to or for use in any country other than a coun-

try with which the United States is at war, where armed hostilities are in progress, or where there is imminent danger to the public health or the physical safety of United States travellers."

Pub.L. No. 95–426, Title 1, § 124, 92 Stat. 971 (1978). Agee's passport was not so restricted and this provision does not relate to the revocation of Agee's passport on grounds personal to him that his travel would seriously damage our national security and foreign relations.

22 U.S.C. 211a (Emphasis added). As the last clause indicates, the original purpose of this act was as much to stop Governors, notaries public, clerks of court and others from issuing passports as to recognize the power in the Secretary of State to issue them. This was a task that "naturally fell to the Department of State, as one of its manifestly proper functions" and had been exercised from the start of the nation. G. Hunt, *The American Passport* 36–42 (1898). However, in recent years the significance of passports has changed as they came to be required for international travel.

Pursuant to the statutory authority cited above, that passports "may" be issued under rules prescribed by the President, and in accordance with authority lawfully delegated to him by the President,[8] the Secretary of State, on April 4, 1968 issued the regulation referred to in Agee's complaint:

§ 51.70, Denial of Passports. (a) A passport, except for direct return to the United States, shall not be issued or renewed in any case in which . . .

(4) the Secretary determines that the national's activities abroad are causing or are likely to cause serious damage to the *national security* or the *foreign policy* of the United States . . .

Passport Regulations, 22 C.F.R. § 51.70 (1968), 33 Fed.Reg. 5681 (Emphasis added). Subsection (4) has remained substantially unchanged to this date.[9] Agee's basic contention here, which is supported by the decision of the District Court, is that this regulation is invalid "because Congress has not [validly] acted to grant the Secretary [the] Authority . . ." to exercise the authority conferred by said regulations. (App. 53).

The 1856 provision in § 211a, as quoted above, which authorizes the President to issue passports "under such rules as the President shall designate and prescribe for and on behalf of the United States", is obviously of sufficient breadth to authorize the promulgation of the questioned rule. It is, however, contended that the statute cannot be construed as broadly as Congress provided because to do so would constitute an unconstitutional delegation of legislative power since the statute (§ 211a) contained no adequate standard. *Kent v. Dulles*, and *Zemel v. Rusk*, decided in 1958 and 1965 respectively, held that the President's authority thereunder ". . . authorizes

---

8. "§ 301. General authorization to delegate functions; publication of delegations

"The President of the United States is authorized to designate and empower the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate, to perform without approval, ratification, or other action by the President (1) any function which is vested in the President by law, or (2) any function which such officer is required or authorized by law to perform only with or subject to the approval, ratification, or other action of the President: *Provided*, That nothing contained herein shall relieve the President of his responsibility in office for the acts of any such head or other official designated by him to perform such functions. Such designation and authorization shall be in writing, shall be published in the Federal Register, shall be subject to such terms, conditions, and limitations as the President may deem advisable, and shall be revocable at any time by the President in whole or in part.

3 U.S.C. § 301, 65 Stat. 713. It was this authority that the President relied upon on August 5, 1966, when he issued Executive Order 11295 prescribing rules governing the granting, issuing and verifying of United States passports and delegating his relevant powers to the Secretary of State. The Executive Order provides as follows:

By virtue of the authority vested in me by Section 301 of Title 3 of the United States Code, and as President of the United States, it is ordered as follows:

Section 1. *Delegation of authority.* The Secretary of State is hereby designated and empowered to exercise, without the approval, ratification, or other action of the President, the authority conferred upon the President by the first section of the Act of July 3, 1926 (22 U.S.C. 211a), to designate and prescribe for and on behalf of the United States rules governing the granting, issuing, and verifying of passports . . .

31 Fed.Reg. 10603.

9. The only change since 1968 is that in the present regulation § 51.70 relates to the *issuance* of passports, and § 51.71 provides "a passport may be revoked, restricted or limited where: (a) the national would not be entitled to the issuance of a new passport under 51.70; . . .", 22 C.F.R. § 51.70, 51.71.

only those passport refusals and restrictions 'which it could fairly be argued were adopted by Congress in light of prior administrative practice,' *Kent v. Dulles . . .".* *Zemel v. Rusk*, 381 U.S. at 18, 85 S.Ct. at 1281. It is also contended that there was no administrative practice prior to 1926 of denying passports on grounds that our national security or foreign policy was being or would be seriously damaged.

Such construction of *Zemel v. Rusk*, however, is unwarranted because the Court there *did* uphold the denial of passports to an entire area (Cuba) on the grounds of "national security", 381 U.S. at 16, 85 S.Ct. at 1280, and "foreign policy considerations", 381 U.S. at 13, 85 S.Ct. at 1279. The greater power to deny passports to all citizens for a limited area on such grounds necessarily includes the lesser power to deny a passport to an individual citizen *on the same grounds* where it is *conceded* that his *worldwide activities* have caused serious damage to our national security and foreign policy, and that his stated intention to continue such activities was "likely to cause" additional damage of the same character. (App. 34, 29) This point, however, is not asserted as the rule for decision here, because the Department's administrative history of passport revocation, which was adopted by Congress in its 1978 enactment, supports the regulation and the revocation in Agee's case. No nation should request another nation to aid one of its citizens who admittedly intends to damage its national security and foreign policy.

### IV.

### THE SUPREME COURT AND PASSPORT REVOCATION

Agee contends that the Supreme Court cases discussing passport denials support his case. However, the two major cases, *Zemel v. Rusk* and *Kent v. Dulles*, actually provide much stronger support for the Government's case. The analysis of this issue must start with the *admission* by Agee that his travel activities have caused serious damage to the national security and foreign policy of the United States and that he intends to continue these activities. Notwithstanding this concession, Agee argues that Congress did not intend, when it authorized the President to issue passports "under such rules as he shall designate and prescribe," that he should be able to promulgate a regulation authorizing the revocation of passports for damage to our national security or foreign policy. On the basis of these facts, the following discussion will establish that *Zemel v. Rusk* and *Kent v. Dulles* support the presidential power to revoke Agee's passport on two separate grounds, either of which furnishes sufficient grounds to revoke his passport. *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) is analyzed first because it is the most recent case, because it modifies *Kent* to some extent, and because it supports the revocation of Agee's passport without any reliance on the affidavits filed by the parties in this Court.

### A. The Cuban Area Passport Restriction in Zemel.

Chief Justice Warren's opinion in *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) followed *Kent* by seven years. *Zemel* clearly distinguishes *Kent* from the kind of facts we have here, and it also holds that passports to designated areas may be denied on *national security* and *foreign policy* grounds. Even though it dealt with an area limitation, it provides support for the position of the Government when applying the same grounds to the revocation of an individual's passport. *Zemel* holds that the Passport Act of 1926 authorized the President to impose area restrictions on travel by United States citizens to Cuba. It distinguished *Kent v. Dulles* on the ground that *Zemel* was based on "national security" and "foreign policy" considerations affecting all citizens and was not based on an applicant's political beliefs or associations. 381 U.S. at 13, 16, 85 S.Ct. at 1279, 1280. The same distinction exists here between *Kent* and *Agee*.

In distinguishing *Kent v. Dulles*, Chief Justice Warren noted that *Kent* involved a passport denial based on the applicant's

"political beliefs or associations." 381 U.S. at 13, 85 S.Ct. at 1279. He referred to *Kent* and pointed out: "[i]n finding that history [prior administrative practice] did not support the position of the Secretary in that case, we summarized that history 'so far as material here'—that is, so far as material to passport refusals *based on the character of the particular applicant* [*Kent*]." *Id.* (Emphasis added) Then he added: "the Secretary [of State in *Zemel*] has refused to validate appellant's passport not because of any characteristic peculiar to appellant, but rather because of *foreign policy considerations* affecting all citizens." *Id.* (Emphasis added). Also, most importantly for this case, the *Zemel* Court held that *it was not restricted to relying on pre-1926 administrative practices* :

> Even if there had been no passport legislation enacted since the 1926 Act, the post-1926 history of executive imposition of area restrictions, as well as the pre-1926 history, would be of relevance to our construction of the Act. *The interpretation expressly placed on a statute by those charged with its administration must be given weight by courts faced with the task of construing the statute. Udall v. Tallman,* 380 U.S. 1, 16–18 [85 S.Ct. 792, 801–802, 13 L.Ed.2d 616]; *Norwegian Nitrogen Co. v. United States,* 288 U.S. 294, 315 [53 S.Ct. 350, 358, 77 L.Ed. 796].

381 U.S. at 11, 85 S.Ct. at 1278 (Emphasis added) The Court then proceeded to uphold the Cuban area passport restriction.

In reaching its conclusion in *Zemel*, the Court also placed strong reliance upon the Hostage Law, 22 U.S.C. § 1732, which has been unchanged as a United States Law since 1868. Act of July 27, 1868, ch. 249, § 3, 15 Stat. 224, R.S. § 2001.

> *It also cannot be forgotten that in the early days of the Castro regime, United States citizens were arrested and imprisoned without charges.* We think, particularly in view of the President's statutory obligation to "use such means, not amounting to acts of war, as he may think necessary and proper" to secure the release of an American citizen unjustly

deprived of his liberty by a foreign government,[16] that the Secretary has justifiably concluded that travel to Cuba by American citizens might involve the Nation in dangerous international incidents, and that the Constitution does not require him to validate passports for such travel.

[16] R.S. § 2001, 22 U.S.C. § 1732 (1958 ed.), provides:

> "Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, *the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release*; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress."

381 U.S. at 15, 85 S.Ct. at 1280 (Emphasis added). Section 1732, as applied in *Zemel*, thus supports the revocation of Agee's passport. When the facts of this case are taken by their four corners it is obvious that the Secretary of State, acting as the President's lawful delegate, has determined that the revocation of Agee's passport is one of the means "necessary and proper to . . . effectuate the release" of the American hostages held captive in Iran. The Hostage Statute fits the present situation in Iran like a glove and, as in *Zemel*, supports the Secretary's denial (or revocation) of a passport. The District Court recognized the Executive's "extraordinary authority to act" under § 1732 and stated that "[i]f [Agee's] activities are detrimental to the hostages in Iran . . . his passport may be cancelled . . ." under § 1732. (App. 53) However, for some unexplained reason the court failed to recognize the strong factual circumstances which bring § 1732 into play as one of the statutes that justifies the revocation.

The factual situation in the instant case furnishes much stronger support for the

application of § 1732 than the facts described and relied upon in *Zemel.* United States citizens in Iran are *presently* under arrest and imprisoned without charges. The record before the District Court disclosed some possibility that Agee might participate in a "Tribunal" that would judge these American citizens. His participation may or may not have been a realistic possibility. However, it was a rational conclusion at the time, given the news reports, Agee's renegade character,[10] his past activities and stated future intentions, and the absence of any public denial that he might participate as reportedly requested by the militants in Iran. The passport revocation may have caused him to *assert* a change of mind.

Section 1732 is broad. Congress authorized the President to use "such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release . . ." of United States citizens who are unjustly deprived of their liberty by any foreign government. The revocation of Agee's passport on national security and foreign relations grounds is obviously in pursuit of such objective and is amply supported by § 211a, the cited regulation, and the co-extensive authority conferred by § 1732.

The *Zemel* Court also noted "[t]hat the [Cuban area] restriction [on passports] which is challenged in this case is supported by the weightiest considerations of *national security.*" 381 U.S. at 16, 85 S.Ct. at 1280

(Emphasis added). Reference was made to the prior Cuban missile crisis and Castro's holding of some Americans without charges.[11] While Iran is more distant than Cuba, the present Iranian crisis evokes many of the same considerations on a *more immediate basis.* In fact, the present forcible occupation of our Embassy in Iran and the holding of our official staff as hostages are more properly considered as an act of war than the situations in the Cuban missile crisis and the prior arrest without charges of Americans in Cuba.[12] None of our Embassy officials were seized or confined in Cuba. The "hostage" situation relied on by the Court in *Zemel* was at best minimal compared to the present situation in Iran. All civilized nations for 2,500 years have treated the persons of diplomatic envoys as inviolable. Thus, the *Zemel* Court's reliance on § 1732 and national security and foreign policy grounds, when applied to the instant case, lead inevitably to the conclusion that the revocation of Agee's passport is authorized by the same considerations.

The disposition that *Zemel* makes of the challenge to the delegation of legislative power is equally applicable to *Agee* :

> Finally, appellant challenges the 1926 Act on the ground that it does not contain sufficiently definite standards for the formulation of travel controls by the Executive. It is important to bear in mind, in appraising this argument, that

---

10. The Congress recognized in 1918 when it passed the Act requiring citizens to have passports to leave or enter the United States that nations in conflict with the United States "will wherever possible employ *renegade Americans* . . . as her agents instead of employing [their nationals] about whom suspicion would easily be excited." H.R.Rep. No. 485, 65th Cong., 2d Sess. 2 (1918) on H.R. 10264 (Emphasis added). The same situation continues to exist. *United States v. Rosenberg,* 200 F.2d 666 (2d Cir. 1952), *sub nom. Rosenberg v. United States,* 346 U.S. 273, 73 S.Ct. 1152, 97 L.Ed. 1607 (1953).

11. As is apparent from the Zemel's Petition for Rehearing in the Supreme Court, pp. 6-8, these facts were *not* in the *Zemel* record. The Supreme Court in effect took judicial notice of them.

12. The use of force against the official staff of the United States Diplomatic Mission to Iran and the seizure and occupation by force of the United States Embassy in Iran may be said to be an act of war, but no state or condition of war exists without such a declaration by the Congress. 10 M. Whiteman, *International Law* 1 (1968); VI G. Hackworth, *International Law* 163 (1943). A contention with insurgents is not war, 2 H. Lauterpacht, *International Law* (Oppenheim) 167 (6th Ed. 1944), though the instant situation may create doubt as to whether the "contention" at the present time does not extend beyond the insurgents. The present situation in Iran is very similar to that which existed during the early stages of the so-called Boxer Rebellion in China in 1900 before the use of force and troops by the United States. *II Encyclopedia Britannica, Micropaedia* 210.

because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, *Congress—in giving the Executive authority over matters of foreign affairs— must of necessity paint with a brush broader than that it customarily wields in domestic areas.*

"Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 324 [57 S.Ct. 216, 222, 81 L.Ed. 255].

This does not mean that simply because a statute deals with foreign relations, it can grant the Executive totally unrestricted freedom of choice. However, the 1926 Act contains no such grant. We have held, *Kent v. Dulles, supra,* and reaffirm today, that the 1926 Act must take its content from history: it authorizes only those passport refusals and restrictions "which it could fairly be argued were adopted by Congress in light of prior administrative practice." *Kent v. Dulles, supra,* at 128 [78 S.Ct. at 1719]. So limited, the Act does not constitute an invalid delegation.

381 U.S. at 17–18, 85 S.Ct. at 1281 (Emphasis added). In essence, the *Zemel* Court added another broad ground to the list in *Kent,* discussed *infra,* that the Executive may rely upon to withhold or revoke passports and the *prior administrative practice* of the Secretary supports the revocation of Agee's passport.

B. *History of Administrative Denial of Passport Applications.*

*Zemel* holds that the interpretation of the Act by the Executive charged with its administration before its 1926 reenactment, *and subsequent thereto,* may both be considered in determining whether Congress will be deemed to have recognized and consented to the exercise of particular authority. This calls for a review of past passport practices to determine "which it could fairly be argued were adopted by Congress in light of prior administrative [executive] practice." *Zemel v. Rusk,* 381 U.S. at 18, 85 S.Ct. at 1281. Interim declarations by Congress are also relevant to this review.

In times of emergency Congress has recognized that certain factors should be taken into consideration in the issuance of passports, i. e., "public safety"; [13] "the interests of the United States"; [14] "if [the President] deems that the interests of the United States so require"; [15] "[promote] . . . the national defense"; [16] "inimical to the best interests of the United States"; [17] "needed to insure the national security." [18] Following these declarations, Congress in 1978 continued the passport requirement [19] because the "public safety" so required.[20] The traditional needs of national security had previously been considered in connection with the emergencies legislation.[21]

---

13. Act of May 22, 1918, ch. 81, 40 Stat. 559.

14. Act of June 21, 1941, ch. 210, 55 Stat. 253.

15. S.Rep. No. 444, 77th Cong., 1st Sess. 1 (1941).

16. *Id.*

17. *Id.*

18. H.R.J.Res. 423, 82d Cong., 2d Sess., 66 Stat. 54, 57 (1952); S.J.Res. 156, 82d Cong., 2d Sess., 66 Stat. 96 (1952); H.J.Res. 481, 82d Cong., 2d Sess., 66 Stat. 137 (1952); H.J.Res. 477, 82d Cong., 2d Sess., 66 Stat. 330, 333 (1952).

19. 8 U.S.C. § 1185(b), 92 Stat. 993 (1978).

20. S.Rep. No. 1168, 94th Cong., 2d Sess. 32–33 (1976), U.S.Code Cong. & Admin.News 1976, p. 2288.

21. S.Rep. No. 549, 93rd Cong., 1st Sess. 83–84 (1973).

The 1978 Act continued the emergencies passport requirements into the so-called peacetime future.

This brings up the passport practices before and after the 1926 reenactment of § 211a. Even prior to the 1856 Passport Act the Executive issued passports on a discretionary basis.[22] During the Civil War passports were required by an order of the Secretary of State and were denied to those subject to military service without a bond.[23] Passports were also denied to citizens "on errands hostile and injurious to the peace of the country and dangerous to the Union."[24] While national security is more vital in wartime, it is always a matter of major governmental concern.

The Attorney General in 1901 ruled that a passport may be denied in the "discretion" of the Secretary of State, for "an avowed anarchist, for instance."[25] In 1903 President Roosevelt promulgated passport rules which authorized the rejection of applications which would "further an unlawful or improper purpose."[26] In 1906 the Solicitor of the Department of State advised that a passport could be denied to a citizen who had gone to China and became notorious as a promoter of gambling and prostitution because he "is likely to embarrass the United States."[27] In 1907 the Department approved a decision of the Consul General

refusing to issue a passport to one engaged in blackmailing and "disturbing, or endeavoring to disturb, the relations of this country with the representatives of foreign countries."[28] This is a perfect description of Agee's presently stated intention. The Department also asserted the right to deny passports "on high grounds of public policy" and if there "is reason to believe that he will put the passports to an improper or unlawful use."[29]

In 1920 President Wilson's passport rules authorized the Secretary "to refuse [passports] in his discretion" to those who were "within a dangerous class."[30] Following the enactment of the 1926 Act, President Coolidge issued new passport rules in 1928. These required applicants to state the object of their trip to each country and furnish proof thereof, and authorized the Secretary to deny passports in his discretion.[31] President Hoover's Executive Order was identical,[32] and President Franklin D. Roosevelt's order was substantially the same.[33] The Passport Division Office Instructions of July 30, 1937[34] set forth examples of persons who could be denied passports under the discretionary power of the Secretary. These included persons guilty of disloyal acts, persons suspected of an intention to commit a crime or otherwise to bring grave discredit on this country, evaders of justice,

**22.** *See, e. g.,* 2 C. Hyde, *International Law Chiefly as Interpreted and Applied by the United States* 1195 (1945); 3 G. Hackworth, *Digest of International Law* 498 (1942); 3 J. Moore, *Digest of International Law* 919–23 (1906).

**23.** G. Hunt, *The American Passport* 49–54 (1898).

**24.** 3 Moore, *supra* note 22, at 920. Mr. Seward, Secretary of State in 1861, prescribed this class of people, and informed his Department that it was "strictly enjoined to grant no passport whatever to any person of whose loyalty to the Union you have not the most complete and satisfactory evidence." *Id.*

**25.** 23 Op.Atty.Gen. 509, 511 (1901).

**26.** 3 Moore, *supra* note 22, at 902; Rules Governing the Granting and Issuing of Passports in the United States, September 12, 1903.

**27.** 3 Hackworth, *supra* note 22, at 498–99.

**28.** 1907 Foreign Relations of the United States, Part 2, at 1076, 1080, 1082 -83.

**29.** *Id.*

**30.** Hearings on Right to Travel, Part 2, Subcommittee on Constitutional Rights, Senate Judiciary Committee, 85th Cong., 1st Sess. 343–50 (1957) (hereafter 1957 Senate Hearings).

**31.** Exec. Order No. 4800 (1928).

**32.** Exec. Order No. 5860 (1932).

**33.** Exec. Order No. 7856 (1938), 3 Fed.Reg. 681.

**34.** Passport Division Office Instructions of July 30, 1937 (Abstract of Passport Laws and Precedents, Code No. 7.22).

and "those who wish to go abroad to take part in the political or military affairs of foreign countries in ways which would be contrary to the policy or inimical to the welfare of the United States." The 1957 Senate Hearings at 74 set forth two examples of passports denied on the latter ground.

The 1930's was also the period when a number of area restrictions were imposed on the issuance of passports. These included Spain (1936) [35], Ethiopia (1935) [36], China (1937) [37], Europe (1939) [38], and after World War II, Hungary, Czechoslovakia, Albania, Bulgaria, Communist China, Rumania and the Soviet Union.[39]

The rules issued under the 1941 Act recognized the Secretary's discretion and called for consideration of whether the use of the passport would be "prejudicial to the interests of the United States." [40] In 1947, instructions to consular officers called for passport applications to be referred to the Department wherever the applicant's political activities were "of a character which tends to be inimical to the best interest of the United States or detrimental to international harmony and understanding." [41] From 1948 to 1955 the Department notified all "Bearers of Passports" as follows:

*Engaging in political affairs in foreign countries*

The Department has always considered that it is improper for American citizens to interfere in the political affairs of foreign countries and in general *has taken such action as ground for refusing pass-*

*port* and registration facilities to them or extending protection to them.[42]
(Emphasis added)

Foreign policy considerations were also made a basis for denying passports in the regulation issued in 1952. This authorized such action when citizens were engaged in activities which would violate laws designed to protect the security of the United States "[i]n order to promote the national interest by assuring that the conduct of foreign relations shall be free from unlawful interference." [43] The 1956 amendment of this regulation provided that passports should be denied for activities "prejudicial to the orderly conduct of foreign relations; or . . . prejudicial to the interests of the United States." [44] In 1968 this standard was restated to authorize passport denial for an applicant whose activities abroad are causing or are likely to cause serious damage to the national security or foreign policy of the United States.[45] This regulation has not been changed in the past 12 years, and constitutes the present standard.

The passport practices of the State Department through the years have been fully communicated to Congress. The 150 year precedent of denying passports to those who could interfere with the Secretary carrying out our foreign policy was reported to Congress in 1956, and six examples in 1955 were cited where passports were refused to "participants in political affairs abroad whose activities were deemed harmful to good relations." [46] These six refusals were called to the Senate's attention in 1957 along with several current denials for travel to certain areas which "would be prejudicial to the foreign policy of the United States

---

**35.** 3 Hackworth, *supra* note 22, at 533.

**36.** *Id.* at 531.

**37.** *Id.* at 532.

**38.** 4 Fed.Reg. 3892 (1939) (unless the applicant could prove the "imperitiveness" of his proposed travel).

**39.** 33 Dept. of State Bull. 777 (Nov. 14, 1955).

**40.** 6 Fed.Reg. 6069–70, 6349, 5821 (1941). The 1942 amendments made no change. 7 Fed.Reg. 2590, 3708 (1942).

**41.** Foreign Service Serial No. 747 (August 7, 1947) at 5.

**42.** State Department Publication, "Information for Bearers of Passports," 1948–1955.

**43.** 17 Fed.Reg. 8013 (1952).

**44.** 21 Fed.Reg. 336 (1956).

**45.** 22 C.F.R. § 51.70(b)(4).

**46.** Hearings on H.R. 9991, Subcommittee No. 1, House Judiciary Committee, 84th Cong., 2d Sess. 12–13 (1956).

. . . ." [47] During the same hearings the State Department reported that 166 passports had been refused for "*Security Reasons*" during the 55 month period from February 5, 1951 to August 31, 1952 and from January 1, 1954 to December 31, 1956.[48]

The Senate subcommittee was fully informed of the Department regulations and interpretations, the extent and exercise of departmental discretion [49], and that the regulations merely confirmed Department practice "as far back as you can trace it" of refusing passports to persons who were acting "contrary to the policy of the United States." [50] The Legislative Reference Service of the Library of Congress reported in 1957 that passports were denied to "those on missions adverse to the national interests" and that the political officers in the Department would determine whether travel would be "harmful to the national interests." [51]

Following the 1958 decision in *Kent v. Dulles*, Congress was advised that the Executive had traditionally denied passports where their issuance would be "inimical to United States foreign relations." [52] This practice continued after *Kent* [53] and in 1960 a Congressional Staff Report to the Senate Committee on Government Operations reported

that the authority to issue or withhold passports has, by precedent *and law*, been vested in the Secretary of State as a part of his responsibility to protect American

citizens traveling abroad, and what he considered to be the best interests of the Nation.[54]

(Emphasis added)

Passports have also been denied where the citizen's acts were not illegal but were considered inimical to the interests of the United States. Examples: Colonel Hubert F. Julian (supplying arms to various countries),[55] and Charles Luke McKissack and his assistant (attorneys for Mrs. Sirhan).[56] The Note, *Passport Refusals for Political Reasons: Constitutional Issues and Judicial Review*, 61 Yale L.J. 170 (1952) reported several similar well known passport denials: Kamen (a radiation physicist who had *carelessly* disclosed confidential information to a Soviet vice-counsel, *Id.* at 174–76); Isacson (American Labor Party member who proposed to aid the Greek rebels, *Id.* at 176); Robeson (speaking and giving concerts abroad "not in interests of the United States", *Id.* at 176–77); Lamont (left-wing writer, travel "not . . . in the best interests of the United States," *Id.* at 177); Charles E. Davis (spied for Senator Joseph McCarthy on Communists and United States diplomatic personnel "to the prejudice of Switzerland," *Id.* at 178).

*In analyzing prior administrative practice it is erroneous to restrict the inquiry solely to revocations since 1968 (App. 50) when the regulation reached its present form. That regulation merely codified the Secretary's long standing interpretation of his authority under the statute since the date of its*

47. 1957 Senate Hearings, *supra* note 22, at 73, 128 -29.

48. *Id.* at 40.

49. 1957 Senate Hearings, *supra* note 22, at 59, 66- 68, 75, 101, 164–65, 180–81, 248–49, 266.

50. *Id.* at 60.

51. Hearings in S.Res. 49, Subcommittee on Constitutional Rights, Senate Judiciary Committee, 85th Cong., 1st Sess. 175–84 (1957).

52. H.R.Rep. No. 2684, 85th Cong., 2d Sess. 2 (1958).

53. Hearings on H.R. 13760, House Committee on Foreign Affairs, 85th Cong., 2d Sess. 32, 63 (1958); Hearings on S. 2770, S. 3998, S. 4110,

S. 4137, Senate Committee on Foreign Relations, 85th Cong., 2d Sess. 22 23, 25 (1958).

54. Staff Report, Reorganization of the Passport Functions of the Department of State, Senate Committee on Government Operations, 86th Cong., 2d Sess. 13 (1960).

55. *Developments in the Law, The National Security Interest and Civil Liberties*, 85 Harv.L. Rev. 1130, 1150 n. 76 (1972).

56. *Sirhan v. Rogers*, No. 70–3965 (S.D.N.Y. Sept. 11, 1970); No. 35364 (2d Cir., Oct. 5, 1970) (attempts to enjoin the revocation denied in both Courts).

*original enactment in 1856. It is this consistent interpretation of the Act over its entire life that constitutes the prior administrative practice that must be considered.* Congress was fully aware of the Department's denials of passports on grounds of national security and foreign policy, it never objected thereto, and it enacted the present law in 1978 requiring passports with full knowledge that the Department would follow its long standing administrative. practice applying and interpreting the relevant statutes and regulations.

Therefore, when Congress, with detailed knowledge of the Department's interpretation of its authority and the statute, adopted the present statute in 1978, without altering the existing statutes, it adopted and confirmed the authority of the Executive to continue its prior administrative practise. *Chemehuevi Tribe of Indians v. FPC,* 420 U.S. 395, 410, 95 S.Ct. 1066, 1075, 43 L.Ed.2d 279 (1975); *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Zemel v. Rusk,* 381 U.S. at 12, 18, 85 S.Ct. at 1278, 1281; *Kent v. Dulles,* 357 U.S. 125, 127, 78 S.Ct. 1118.

In view of this history it was error for the District Court to conclude that the Secretary, in denying passports on national security and foreign policy considerations through the years, has not followed "administrative practice sufficiently substantial and consistent to warrant [the implied approval of] Congress." *Zemel v. Rusk,* 381 U.S. at 12, 85 S.Ct. at 1279. The denial of passports to those who intend to cause serious damage to our national security and foreign policy is the very minimal basis that Congress would expect the Department to follow. Congress has so indicated by its

refusal since 1856 to make any change in the basic grant of authority to the President. 22 U.S.C. § 211a. Prior administrative practice therefore under *Zemel v. Rusk* supports the revocation of Agee's passport on national security and foreign policy grounds. Section 1732 is additional support for such revocation.

Finally, in view of Agee's past activities and his admissions here, two additional statutes add support to the Secretary's revocation of Agee's passport on national security grounds. First, Congress recognized in the statute establishing the Central Intelligence Agency that it was "in the interest of *national security* . . ." to "[protect] intelligence sources and methods from unauthorized disclosure" and to maintain "the security of foreign intelligence activities of the United States". 50 U.S.C. §§ 403(d)(3), 403g [57] (Emphasis added). Therefore, revoking Agee's passport in an attempt to stop his disclosure of "intelligence sources and methods," *id.,* is statutorily recognized as being "in the interest of national security."

That national *security* considerations were to be considered in granting or denying passports also derives some support from the Act of June 27, 1952, which provided that the Administrator of the Bureau of Security and Consular Affairs of the Department of State, which Bureau includes the Passport Office, "shall have authority to maintain direct and continuous liaison with the [FBI and the CIA] and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in en-

---

**57.** Title 50 U.S.C. § 403 provides:

"(d) For the purpose of coordinating the intelligence activities of the several Government departments and agencies *in the interest of national security,* it shall be the duty of the [Central Intelligence] Agency, under the direction of the National Security Council . . . (3) . . . That the Director of Central Intelligence shall be responsible for *protecting intelligence sources and methods* from unauthorized disclosure . . . ." (Emphasis added).

Section 403g provides:

"In the interests of the *security* of the foreign intelligence activities of the United States and in order further to implement the proviso of section 403(d)(3) of this title that the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." (63 Stat. 211)

forcing the provisions of this Chapter [58] *in the interest of the internal security of the United States.*" 8 U.S.C. § 1105 (66 Stat. 174–175, 91 Stat. 847).

It thus appears that *Zemel* greatly expands *Kent's* illegal conduct grounds, see V, *infra,* and provides additional authority for the revocation of passports on national security and foreign policy grounds where such action is consistent with historical administrative practice.[59] Revoking Agee's passport, and thereby hopefully halting the illegal and dangerous release of intelligence sources and methods throughout the world, is clearly within the interests of national security. Therefore, the Secretary's action in the instant case was authorized by Congress and was lawful.

## V.

### *KENT v. DULLES* ANALYZED AND DISTINGUISHED

Agee contends that *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), does not support revocation on national security or foreign policy grounds. That case, however, is not authority on such point because the Court never discussed such grounds notwithstanding the argument in its dissent, that *such grounds were present.*[60] *What is of significance here is that Kent did recognize that passport revocation is authorized when the applicant has engaged in conduct that is "illegal" or in "violat[ion of] the laws of the United States." Id.* 357 U.S. at 127, 78 S.Ct. at 1119.

The record before the District Court indicates instances of illegal conduct in violation of 18 U.S.C. § 793(d). This is sufficient under *Kent* to support the passport revocation. In addition, the McMahon and Agee affidavits before *this Court* indicate additional illegal conduct of a very serious nature. This decision does not rely on these additional violations but because of their serious nature they are not overlooked and are discussed in the Appendix in the event that his conduct receives further consideration. (App. 80–98) The serious damage to our national security and foreign policy which is present in the record before the District Court, and is conceded, also involves "illegal conduct."

Kent was denied a passport by the Government, in accordance with the then existing regulations, which required an applicant to submit an affidavit stating whether he was then or ever had been a communist. When Kent refused to submit such an affidavit, his passport application was denied and he brought a successful suit for declaratory relief. The Supreme Court upheld his claim and ruled that "freedom to travel is . . . an important aspect of the citizen's 'liberty'". 357 U.S. at 127, 78 S.Ct. at 1119.

The opinion stated that the power granted the President by Congress did not extend to denying passports for refusal to file such affidavits. In the course of reaching that conclusion the Court defined several areas in which Congress had authorized passports to be denied. First, naturally, was when citizenship or allegiance did not exist.

---

**58.** 8 U.S.C. § 1185(b), requiring passports of citizens, is part of the "Act" referred to. Cf. 66 Stat. 175, 190.

**59.** 22 U.S.C. § 1732 provides additional authority.

**60.** The contention is made that the denial of passports in *Kent* "to communist party members and sympathizers" "assuredly involved foreign policy and national security considerations" the same as the Cuban area ban. While *Kent* may have *"involved"* some such "considerations," the record was deficient in *proof* that the issuance of passports without non-communist affidavits would *cause or be likely to cause*

*serious damage to our national security or foreign policy.* The ideological factors also created additional constitutional overtones that could not be surmounted. *Kent* involved denial of passports on ideological grounds, weakly asserted. In contrast, Agee's passport was revoked because of acts *admittedly* damaging to the national security; which he conceded were likely to continue. Also, in *Kent* the government never had a hostage situation to bring § 1732 into play as the Court did in the Cuban situation, and as we have here with our embassy hostages in Iran.

Second, was [when] . . . the applicant was participating in illegal conduct, trying to escape the toils of the law, promoting passport frauds, or otherwise engaging in conduct which would violate the laws of the United States.

*Id.* at 127, 78 S.Ct. at 1119. The Court also stated that in the light of prior administrative practices those two categories were the only ones which it could fairly be argued were adopted by Congress when Congress reenacted the statute in 1926. *The Court, however, did observe that one can find in the records of the State Department "rulings of subordinates covering a wider range of activities than the two indicated." Id.* at 128, 78 S.Ct. at 1119. However, consideration need not be taken here of such communist activities. The Court merely refused to give the Secretary of State "unbridled discretion" to grant or withhold a passport from a citizen for any substantive reason he may choose. *Id.* Withholding passports on national security and foreign relations grounds is not an exercise of "unbridled power." After explaining that the refusal to file a non-communist affidavit did not relate to citizenship or allegiance on the one hand, or to criminal or unlawful conduct on the other, the Court ordered the issuance of the passport.

*Kent* did not involve serious damage to the national security of the foreign policy of the United States. The Court said "[w]e deal with beliefs, with associations, with ideological matters." *Id.* at 130, 78 S.Ct. at 1120. Agee does not present a case that deals with beliefs, associations or ideological matters. Rather Agee's *acts* cause serious damage to our national security and foreign policy, and such conceded damage involves *illegal conduct.* Thus, *Kent v. Dulles* is important for its recognition that passports may be denied where the person was participating in *illegal conduct* which would violate the laws of the United States. 357 U.S. at 127, 78 S.Ct. at 1118. This brings to the fore an analysis of Agee's acts that constitute illegal conduct.

A. *Illegal Conduct Under Kent v. Dulles as a Grounds for Passport Revocation.*

In this case Agee has conceded that his actions "have caused serious damage to the national security and foreign policy of the United States" and that "[his] stated intention to continue such activities threatens additional damage of the same kind." (App. 13, 30) From the facts that the court may consider under judicial notice, Fed.R. Evid. 201(b), (c), (f), and the affidavits filed in the District Court, it may also be concluded that in causing "serious damage to the national security and foreign policy" Agee has been, and is, "participating in illegal conduct . . . which would violate the laws of the United States". 357 U.S. at 127, 78 S.Ct. at 1119. He has also stated his intention "to continue such activities" which, it will be demonstrated, violate our laws.

In developing this point it should be first noted that the case now before this Court is a *de novo* separate judicial proceeding and not a direct appeal from an administrative decision where the reviewing court is limited strictly to the factual and legal considerations upon which the administrative action was based. Cf. *Securities and Exchange Commission v. Chenery Corporation*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). It is thus permissible on this appeal to rely upon facts set out in the uncontradicted affidavits of record in the District Court, the concessions of appellant, the conclusions of law and fact admitted by the parties in *this proceeding,* and any fact of which judicial notice may be taken because it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R.Evid. 201(b), (c), (f).

Agee's complaint alleges that "exhaustion of administrative remedies is not required . . ." (App. 4), and he did not exhaust his administrative remedies. He thus avoided cross-examination, but also lost whatever advantage might accrue to him

from this Court being limited to the administrative record. While a bare bones decision can be rendered on the limited facts in this record, the case would have better presented the issues if the Department hearing had been held, or if the trial court had held an evidentiary hearing, or if the Government had taken Agee's deposition, because "the facts as viewed by an administrator's expert eye may provide guidance to a court in reaching constitutional determinations . . .." *Plano v. Baker*, 504 F.2d 595, 599 (2d Cir. 1974). *Cf. Robeson v. Dulles, supra* note 4. His deposition might also have provided further illuminating facts as to his conduct and intentions. However, the record is sufficient to support the revocation of his passport for the "illegal conduct" which is involved in his past disclosure of secret CIA information in violation of the applicable criminal statute.

The most striking example of Agee's illegal conduct is seen under the Wilful Communication of Defense Information statute. 18 U.S.C. § 793(d). This statute provides:

"Whoever, lawfully having possession of . . . information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits, or causes to be communicated . . .

[etc.] . . . the same to any person not entitled to receive it . . . [s]hall be fined . . . or imprisoned . . ." [61]

The record indicates that Agee, by his disclosures throughout the world of the identity of undercover CIA agents, and CIA sources and methods, 50 U.S.C. § 403(d)(3), *supra,* has clearly violated 18 U.S.C. § 793(d). Such disclosure of the identities of the agents, or CIA sources and methods, in each foreign country would support a separate indictment. The District Court could have concluded from the record that Agee committed such offense, thus justifying revocation of his passport under *Kent.* A draft indictment is set forth in the margin.[62]

### B. *The Relationship of the Passport Regulation to Illegal Conduct.*

The District Court remarked that: "If Agee is indicted for any violation of law, his passport may be cancelled". (App. 53) Agee argues that any criminal conduct cannot support the revocation of his passport on national security and foreign policy considerations unless they comply with a separate Passport Regulation which authorizes revocation for crimes in certain stages of prosecution. The regulation referred to provides that passports shall not be issued, except for direct return to the United

---

**61.** 18 U.S.C. § 793(d) provides:

(d) Whoever, lawfully having possession of . . . information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it . . . [s]hall be fined . . . or imprisoned . . . or both. (64 Stat. 1003).

**62.** *Transmitting Injurious Defense Information,* 18 U.S.C. § 793(d)

The Grand Jury charges:

That Philip Agee, a former intelligence agent of the Central Intelligence Agency of the United States (hereinafter CIA), having

lawful possession of information relating to the national defense of the United States, to wit, information identifying _____ and _____ and _____ and _____ as intelligence agents of the CIA assigned to (*Nation*), which information relates to and is an integral part of the United States' defense and which the said Agee had reason to believe could be used to the injury of the United States and to the advantage of a foreign nation, did, on or about the _____ day of _____, 19___, at a public press conference in the city of _____, (*Nation*), wilfully communicate, deliver and transmit and cause to be communicated, delivered and transmitted, and attempt to communicate, deliver and transmit and attempt to cause to be communicated, delivered and transmitted the aforesaid information relating to the national defense of the United States to the Government of _____, in violation of 18 U.S.C. § 793(d).

States, where there is an outstanding Federal warrant of arrest for a felony, where parole or probation conditions would be violated or the applicant has been committed to a mental institution, where extradition is sought from a foreign country, or where a subpoena to the passport applicant involves a Federal prosecution or a grand jury investigation. 22 C.F.R. § 51.70(a)(1) to (5).[63] The underlying theory of Agee's contention with respect to this regulation is that it exhausts the circumstances under which illegal conduct may constitute grounds for denying passports. However, such regulation merely provides several specific grounds for denying passports and under *Kent v. Dulles*, 357 U.S. at 127, 78 S.Ct. at 1118, does not foreclose denying passports for citizens who are "otherwise engaging in conduct which would violate the laws of the United States." *Id.*

*Kent* describes those "trying to escape the toils of the law" only as *one group* who might be denied passports. The enumeration of circumstances in subsections (a)(1) to (5) all involve persons that may be characterized as being in that group. The process of the courts has proceeded further with respect to those covered by subsections (a)(1) to (5), but that enumeration is by no means exclusive and *Kent* recognizes that just "participating in illegal conduct" may support a passport denial. *Id.* It is thus clear that illegal conduct need not be formally processed to the stage of indictment, arrest warrant, subpoena, extradition or court order to constitute grounds for denial of a passport.

Since criminal conduct involving "national security" or "foreign relations considerations" constitutes "illegal conduct" and "[vi-

olations of] the laws of the United States," *Kent* recognizes that such conduct may serve as grounds for denying passports even though actual formal criminal charges have not been laid or are not in the process of being prosecuted in some formal manner. *The Government need not proceed against every law violator by formal means in order to prove in some separate proceeding that his conduct was illegal.* Prosecution of offenders is declined in many instances where laws are violated, as in the case of grants of immunity. It would be absurd to hold that because an admitted criminal was given prosecutorial immunity to act as a witness in securing the conviction of other greater criminals, the Government was thereby foreclosed from denying him a passport by proving in a separate passport proceeding that he had violated the United States criminal laws as conceded by his own testimony. Declining prosecution because it would involve the disclosure of informants or classified matter is another example. Also, law violators are frequently permitted to continue without prosecution for a considerable period of time because their surveillance produces evidence of other criminal violations, such as continuing espionage involving others.

The present factual situation is one where the failure of the Government to proceed against a wrongdoer on criminal grounds does not preclude its ability to use civil and other remedies. *See United States v. Kearns*, 595 F.2d 729, 732 (D.C.Cir.1978) (*civil* prosecution of officer of Export-Import Branch for breach of fiduciary duty).

The regulation authorizing the refusal of passport applications where the national's activities abroad are causing or are likely to

---

**63.** 22 C.F.R. § 51.70(a)(1) to (5) provides:

(a) A passport except for direct return to the United States, shall not be issued in any case in which:

(1) The applicant is the subject of an outstanding Federal warrant of arrest for a felony, including a warrant issued under the Federal Fugitive Felon Act (18 U.S.C. 1073); or

(2) The applicant is subject to a court order, or conditions of parole, or conditions of probation forbidding his departure from the United States; or

(3) The applicant is subject to a court order committing him to a mental institution.

(4) The applicant is the subject of a request for extradition or provisional arrest for extradition which has been presented to the government of a foreign country.

(5) The applicant is the subject of a subpoena issued pursuant to section 1783 of Title 28, United States Code, in a matter involving Federal prosecution for, or grand jury investigation of, a felony.

cause serious damage to the national security or the foreign policy of the United States, provides a non-criminal basis for denying passports. The lynchpin to this entire discussion is that Agee's clearly *illegal conduct* also damaged the national security. Thus, the passport revocation was legal under *Kent*, and under § 51.70.

This analysis likewise disposes of the contention that there is some bar to revoking Agee's passport because the Attorney General at some earlier date allegedly stated that the Department of Justice did not intend to bring formal criminal charges against him.

## VI.

## THE PRESENT STANDARD FOR THE ISSUANCE OF PASSPORTS UNDER THE STATUTE REQUIRING PASSPORTS

Generally throughout the history of the United States citizens have *not* been required to have passports to enter and leave the country. However, there have been several exceptions. First, an 1815 enactment during the War of 1812 required passports. Act of February 4, 1815, ch. 31, § 11, 3 Stat. 200. Second, during the Civil War passports were required by order of the Secretary of State. The third exception occurred during World War I when Presidential Proclamation No. 1473 (40 Stat. 1829), under the Act of May 22, 1918, 40 Stat. 559, made it unlawful to leave or enter the United States without a valid passport. This later Act was effective only in wartime but it was amended in 1941 so it could be applied prior to our entry in World War II. Act of June 21, 1941, ch. 210, 55 Stat. 252–53. See the President's Proclamation No. 2523 of November 14, 1941, 55 Stat. 1696. That emergency continued until April 28, 1952 and was then extended until April 1, 1953 (66 Stat. 54, 57, 96, 137, 330, 333). Next, the Act of June 27, 1952, Pub. L.No.414, ch. 2, § 215(b), 66 Stat. 190, authorized the President by Proclamation to require citizens to have passports for foreign travel. It was under this Act that citizens' passports were subsequently required, which authority was scheduled to expire on September 14, 1978.

Each of these instances in our nation's history, when passports have been *required* of our citizens to leave or enter the country, came into force to protect our national security and foreign policy. It was in that climate that passports were to be issued, denied or revoked. Congress' *modus operandi* when it required passports during those periods is significant. In each of those four instances it *never* explicitly provided any standards in the Act that should be followed by the Executive in issuing or refusing to issue passports. Yet, surely Congress implicitly intended that the Executive would apply national security standards in issuing and denying passports. Otherwise, if passports were to be issued to all citizens willy-nilly, the object in requiring passports would be practically meaningless. Thus, the fact that Congress did not specifically provide standards for revocation in the statute requiring passports indicates that Congress recognized the Executive as possessing such power without a more specific Congressional delegation.

All this is relevant to the present situation because *again* in 1978, Congress, in the troubled world situation then existing, again provided by amendment to the 1952 Act, *supra*, that passports were required for all citizens leaving or entering the United States:

> "(b) Except as otherwise provided by the President and subject to such limitations and exceptions as the President may authorize and prescribe, it shall be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport."

8 U.S.C. § 1185(b), Act of October 7, 1978, Pub.L.No.95–426, 92 Stat. 993. The Conference Committee Report on the bill states that the above enactment made permanent the authority of the President to require American citizens to bear valid passports when entering or leaving the United States and preserved the authority that had previ-

ously been exercised on an "emergency basis" from otherwise lapsing in September, 1978.[64]

This whole case turns on the Congressional intent which is indicated by the enactment of this 1978 statute because *that is the present law*. Much of the discussion of the parties as to the intent of earlier Congresses and the effect of earlier court decisions becomes *passe* because of this latest enactment. The intent of Congress in the present law is expressed in the Senate Committee Report on the Bill:

> The committee recognizes clearly that the passport *authority should not be restricted in any way which would limit the President's ability to control the departure of U.S. citizens to foreign countries when such travel is inconsistent with a greater government interest*, such as preventing a citizen who is seeking to avoid the judicial processes of the United States. Nor would the committee wish to limit the President's ability to deter U.S. citizens from entering countries with which the United States is at war or *regions where there are occurring hostilities which relate to American foreign policy interests*.

S.Rep.No.842, 95th Cong., 2d Sess. 14 (1978) (Emphasis added). It is obvious that Agee is interested in travelling to countries where hostilities are occurring which directly relate to American foreign policy interests. In addition, a passport may be denied if Agee's right to travel is inconsistent with "a greater government interest." When that standard is applied the answer is also obvious. The authorization of Agee to travel is clearly inconsistent with, and is outweighed by, the greater government interest of protecting our national security and foreign policy from the serious damage that Agee concedes he intends and which the record indicates he causes. (App. 36–37) Our foreign policy cannot stand much further damage, particularly since Agee is presently directing his attention in Iran and

the near East where the vital interests of our nation are most seriously hazarded.

It should also be noted that the 1978 Act delegates legislative authority over the issuance of passports essentially on the same basis as § 211a, i. e., the same degree of discretion. The two statutes are *in pari materia*—they both authorize the President to promulgate passport regulations—and are to be read together. Thus, the deference due the long standing administrative construction of the President's power under § 211a applies to the same delegation in § 1185(b). The fact that Congress followed the same pattern as § 211a, and gave no indication of its dissatisfaction with the extent of the authority exercised by the President under that section, enhances the conclusion that Congress adopted the prior administrative practice and intended to authorize the Secretary to continue the same practices. *Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 410, 95 S.Ct. 1066, 1075, 43 L.Ed.2d 279 (1975); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–2, 40 L.Ed.2d 134 (1974); *Zemel v. Rusk*, 381 U.S. 1, 18, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965); *Kent v. Dulles*, 357 U.S. 116, 125, 128, 78 S.Ct. 1113, 1119, 2 L.Ed.2d 1204 (1958).

The Secretary of State thus conforms to the intent of Congress, and therefore acts constitutionally, when he revokes a passport under the regulation on the factual circumstances that Agee presents.

## VII.

### CONGRESSIONAL SILENCE AS LEGISLATIVE INTENT

It is argued that Congress has not enacted any of the bills that were introduced in Congress to provide the Executive with specific statutory authority to deny passports when their issuance would cause serious damage to our national security or foreign policy, and that such Congressional silence indicates that Congress thereby intended to

---

**64.** Conference Report on H.R.12598, H.R.Rep. No.1535, 95th Cong., 2d Sess. 44 (1978), U.S.

Code Cong. & Admin.News 1978, p. 2424.

withhold such authority. However, there is a total absence of any specific expression by Congress that in any way indicates any such intent.

Thousands of bills are introduced in every Congress that never see the light of day, like those that were *not* enacted here. The 95th Congress had over 25,000 bills introduced. Yet, less than 650 were enacted into public laws. Persuasive congressional intent cannot ordinarily be discerned from "mere silence". *Boys Market, Inc. v. Retail Clerks Union*, 398 U.S. 235, 241, 90 S.Ct. 1583, 1587, 26 L.Ed.2d 199 (1970). *See also United States v. Bd. of Commissioners of Sheffield*, 435 U.S. 110, 135, 149, 98 S.Ct. 965, 988, 55 L.Ed.2d 148 (1978) ("it is impermissible to draw inferences of approval from the unexplained inaction of Congress"); *Girouard v. United States*, 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946) ("[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law."); *NLRB v. Plasterers' Local Union*, 404 U.S. 116, 129–30, 92 S.Ct. 360, 368-369, 30 L.Ed.2d 312 (1971). Here, no bill ever reached the floor in either house. The mere failure of any legislative body to enact a bill that never reaches a floor in most instances is nothing more than "sound and fury, signifying nothing." Several senators expressing opposition do not constitute congressional intent. Very few laws pass unanimously. Most bills have some opposition. Generally, as here, there are too many variants between the contents of such bills and a pending legal question to convert congressional inaction into the substance of a declared intent. In other instances there is no clear expression by Congress. Then too, subsequent enactments and developments, as here following *Kent*,

and its modification (of Agee's interpretation) by *Zemel*, can create substantive changes that materially affect the construction of a statute.

## VIII.

## ADDITIONAL CONSTITUTIONAL CHALLENGES

Agee raises three additional challenges to the Secretary's actions: (1) violation of the Fifth Amendment's right to travel, (2) violation of the First Amendment, and (3) violation of his right to procedural due process. Each of these contentions has been considered fully and none of them warrant setting aside the revocation of Agee's passport. Since they were not discussed by the District Court nor by this Court there is no necessity to consider them further in this opinion.

## CONCLUSIONS

The Passport Regulations, §§ 50.71(b)(4) and 51.71, which authorize the denial of passports to prevent serious damage to our national security and foreign policy are constitutional on their face, and are constitutional as applied to Philip Agee on the record in this *de novo* declaratory judgment action, in which the existence of such serious damage is conceded.

First, 22 U.S.C. § 1732, with its wide grant of authority to the President in hostage situations, on the authority of *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), authorized the revocation of Agee's passport as part of the President's efforts to free the Americans held hostages in Iran and to conduct our foreign policy.[65]

---

**65.** It is incorrect to say that the Executive did not rely on § 1732 in revoking Agee's passport. He relied on the regulation and the regulation encompassed all functions relating to passports. In issuing the regulation the Secretary specifically relied on "sec. 4, 63 Stat. 111" (see below). Section 1732 clearly contemplated such a function. The "extraordinary authority" (App. 53) conferred by § 1732 in hostage situations is clearly a "function" conferred on the Secretary of State and, being *in pari materia* with the passport statutes, is available to

support the revocation. In applying a rule or regulation it is a misconception of Executive authority for a court to overlook the power conferred by the underlying statute. This may expand or restrict the regulation. Moreover, the District Court in referring specifically to § 1732 did consider the implications of that statute. (App. 53) Section 1732 does confer "extraordinary authority" in hostage situations and is sufficient alone to uphold the revocation. Its force is buttressed by § 211a and § 1185 and prior administrative practice.

The District Court correctly perceived the possible relevance of this statute but did not give full effect to the facts which justify its use to support the instant passport revocation.

Second, Justice Douglas' opinion in *Kent v. Dulles*, 357 U.S. 116, 127, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958) supports the constitutionality of the denial of passports generally, and Agee's in particular, for the "illegal conduct" involved in Agee's violations of 18 U.S.C. § 793(d). It is frosting on the cake that such illegal acts also cause serious damage to our national security and foreign policy and thus provide additional support for revocation under the regulation.

Third, *Zemel v. Rusk* supports the denial of passports on "national security" and "foreign policy" grounds and such denial is consistent with prior administrative practice.

Fourth, in the three instances in 1861, 1918 and 1941, when passports were required to protect our national security and foreign policy, no change was made in the President's authority which was first recognized by the Act of August 18, 1856, 11 Stat. 60–61. Congress again in 1978 required citizens to have passports for foreign travels. In enacting such law the Senate Committee Report on the Act of August 18, 1978, indicated additionally that passports may be denied by the Executive on national security and foreign policy grounds "when such travel is inconsistent with a greater government interest." It is clear here that to issue a passport to a citizen who admittedly has caused and intends to cause serious damage to our national security and foreign policy, and is capable of doing so, would be inconsistent with the "greater government interest" in avoiding serious damage to such vital interests of the nation.

> Section 4 of 63 Stat. 111 provides:
> Sec. 4. The Secretary of State may promulgate such rules and regulations as may be necessary to carry out the functions now or hereafter vested in the Secretary of State or the Department of State, and he may delegate authority to perform any of such functions to officers and employees under his direction and supervision.

There are relatively few United States citizens who have the same capability and vicious intent to damage our national security as has Mr. Agee. And his particular brand of hate, i. e., alleged CIA activities, is presently at the very core of the Iranian "problem" with the terrorists' demand that the Embassy staff be tried as "spies."

To the extent that the foregoing differs from the majority opinion I respectfully dissent.

## APPENDIX

### ILLEGAL CONDUCT BY AGEE AS INDICATED BY AFFIDAVITS FILED IN THIS COURT ON APPEAL

In addition to the record before the District Court, this Court has before it an affidavit filed in the District Court by the Government the day after the District Court released its decision. Three days later on February 1, 1980 the Government filed another affidavit in this Court in support of its Motion for Stay Pending Appeal. The Agee affidavit filed in reply states that the two Government affidavits were read to him. His answering affidavit is very brief and does not contradict a great many very serious allegations concerning his personal actions. Such uncontradicted allegations must therefore be considered as having been admitted. Because of their possible future relevance to Agee's passport they should not be overlooked, and accordingly are analyzed and commented on below.

After Agee was advised that his passport had been revoked, his affidavit to this Court indicates he stated publicly for the first time that he had not intended to visit Iran until the hostages were released. (App. 84, 98)

> Reliance on this statute in the promulgation of the questioned regulations indicates that all relevant "functions" of the Secretary were incorporated into the regulations. And note 8, *supra*, describes the President's delegation to the Secretary of all power under 22 U.S.C. § 211a.

At [the same] time Agee announced that *he had suggested to the Iranian terrorists that they should release the hostages in exchange for all CIA records on CIA intelligence operations in Iran for the past 25 years.* In that connection Agee offered to assist the terrorists in analyzing such documents. According to newspaper accounts the terrorists rejected Agee's offer. Nevertheless, Agee, since that time, is reported to have specifically suggested to the terrorists that he would travel to Iran after the hostages were released. Since it is known that the terrorists obtained Embassy documents when they ransacked the Embassy, Agee's travel to Iran even in the eventuality that the hostages are released, would enable him to do an on-the-spot analysis of the possibly classified documents the terrorists currently possess. Affidavit of John N. McMahon, Deputy Director for CIA operations. (App. 84–85) (Emphasis added).

It is submitted that the uncontradicted facts alleged in these affidavits indicate several instances of serious illegal conduct by Agee. Set forth below are the outlines of several *"national security* and *foreign policy"* violations of United States laws by Agee which are indicated in the affidavits filed in this Court. They are in addition to the § 793(d) violation and each violation constitutes serious damage of the character conceded by Agee's admission. Under *Kent v. Dulles,* any violation of law may support a passport revocation. It is not required that the violation be formally charged. *See* V, B, *supra.*

66. 18 U.S.C. § 7(3) provides:
The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes:
(3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

A.

*The Definitional Criminal Statutes.*

Before detailing such offenses, reference is made to three statutes in the United States [Criminal] Code that are fundamental and applicable to all crimes.

First, 18 U.S.C. § 2(a) provides that "Whoever commits an offense against the United States or aids, abets [or] counsels . . . its commission, is punishable as a principal." (65 Stat. 717).

This statute has very broad implications and applies to all federal crimes.

Second, 18 U.S.C. § 7(3) [66] defines the "special maritime and territorial jurisdiction of the United States" as used in the United States Criminal Code to extend to "Any lands . . . acquired for the use of the United States, and under the . . . concurrent jurisdiction thereof . . . ." (66 Stat. 589).

By virtue of this provision the United States Embassy in Tehran, Iran is within the "special" territorial jurisdiction of the United States. The ground occupied by a United States Embassy is not officially United States territory, IV G. Hackworth, *International Law* 564 (1942), but such premises are subject to the concurrent jurisdiction of the United States criminal laws to the extent indicated by our laws and decisions. An opinion by Judge Craven of the Fourth Circuit in *United States v. Erdos,* 474 F.2d 157, 159–60 (4th Cir. 1973) *cert. denied,* 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122, held with respect to a felony committed in the United States Embassy in Guinea, that 18 U.S.C. § 7(3) grants "Special . . . territorial jurisdiction" with

This definition includes an exercise of the power conferred on Congress "[t]o define and punish . . . Offences against the law of Nations." U.S.Const. art. I, cl. 10. *United States v. Rodgers,* 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071 (1893); *United States v. Flores,* 289 U.S. 137, 153, 53 S.Ct. 580, 583, 77 L.Ed. 1086 (1933). The law of Nations consists of the body of rules and principles of action which are binding upon civilized states in their relations with one another. J. Brierly, *The Law of Nations* 1 (6th Ed. 1976). It is presently described as International Law.

respect to federal crimes committed in an embassy in a foreign country acquired for the use of the United States and under its concurrent jurisdiction. The United States Embassy in Tehran obviously satisfies these requirements.

Criminal statutes addressing conduct that causes direct injury to the United States Government, and which is capable of perpetuation without regard to particular locality, are applicable to United States citizens in foreign countries, even though the statute does not so expressly declare. *Skiriotes v. Florida*, 313 U.S. 69, 74, 61 S.Ct. 924, 928, 85 L.Ed. 1193 (1941); *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922). The laws of the United States follow its subjects "everywhere." *United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 197, 5 L.Ed. 64 (1820). The Supreme Court has refused to rule out the validity of applying United States laws to citizens of foreign countries who act illegally against the United States in foreign countries. *United States v. Bowman, supra.*

The third statute, 18 U.S.C. § 11, provides that the term "foreign government" as used in the United States Criminal Code includes any "faction, or body of insurgents". The

Terrorists holding the American Embassy and hostages within Iran therefore constitute a "foreign government." [67]

With these basic definitions applicable to the crimes proscribed by the United States Criminal Code, it appears from the affidavits that Agee has violated several United States criminal statutes, in addition to 18 U.S.C. § 793(d). These additional violations are outlined below.

### B.

*Illegal Conduct and Violation of United States Laws by Agee.*

(1) Forbidden Intercourse with Foreign Governments (The Logan Act), 18 U.S.C. §§ 953, 11. This and the three remaining offenses are based on the affidavits filed in this Court. (App. 80–100)

Agee is quoted as stating that "in recent weeks" prior to December 23, 1979 he proposed to the "militants" in Iran (who obviously under 18 U.S.C. § 11 are a "faction and body of insurgents" constituting a "foreign government") that they should compel the United States to "exchange . . . the C.I.A.'s files on its operations in Iran since 1950 for the Captive Americans." (App. 94, *Cf.*, 97 ¶ 3) [68] Such conduct vio-

---

**67.** 18 U.S.C. § 11 provides:

§ 11. Foreign government defined

The term "foreign government", as used in this title except in sections 112, 878, 970, 1116, and 1201, includes any government, *faction, or body of insurgents* within a country with which the United States is at peace, irrespective of recognition by the United States.

(Emphasis added). This statute is also authorized by U.S.Const. art. I, cl. 10. See n. 66, *supra*, and text at pp. 51–52.

**68.** The affidavit in this court of John N. McMahon, CIA Deputy Director of Operations refers to a *New York Times* article, 24 December 1979, quoting Agee, that in the "recent weeks" prior to December 23, 1979, he

"proposed to the Iranian government, *to the militants occupying the American Embassy in Tehran* and to [others] . . . that the quickest solution to the crisis would be an exchange of the CIA's files on its operations in Iran since 1950 for the captive Americans."

(App. 94) (Emphasis added). Agee is also quoted as having said that he "will not become

involved in identifying CIA personnel or in analyzing documents *until after all the hostages are released. This I am sure is known by Mr. Vance because my proposals have not been secret." Id.* (Emphasis added). Agee's affidavit, filed in "February, 1980," as part of these proceedings, but after the District Court decision and opinion (App. 97–98), denies that he was ever "invited to Iran *by its government, The Revolutionary Council,* or any representative thereof, for the purpose of sitting on any tribunal whatsoever, or for any other reason . . . ." (App. 98) (Emphasis added). As sweeping as this appears, it does not actually rule out the possibility that he was invited by the "militant" insurgents whom the *Iranian Government* professedly could not control. They had threatened the hostages with trial and execution and Agee told the reporter that *he had talked with the "militants" in "recent weeks"* prior to December 23, 1979. (App. 84 85, 93–95) If Agee was not even *invited* by the "militants" then his admitted conversations with them take on the possibility of even more severe criminality on his part as it would support the possibility that *he initiated* the contact

lates 18 U.S.C. § 953 which prohibits any citizen of the United States from carrying on correspondence or intercourse with any foreign government (the Iranian terrorist faction) "with intent to influence [its] measures or conduct or [that] of any . . . agent thereof." [69] Agee's violation of this act with the Terrorists is self evident from his own uncontradicted statement. A draft indictment is set forth in the margin.[70]

(His communication with the "Iranian Government" (App. 94) could furnish the basis for an additional count.)

(2) The Treason Statute, 18 U.S.C. § 2381. The treason statute makes it an offense to "adhere[ ] to [the] enemies [of the United States], giving them aid and comfort within the United States or elsewhere . . ." 18 U.S.C. § 2381.[71] The

with the militants in which he proposed that they secure the CIA records by extortion. Agee is responsible for the undeveloped nature of such facts. If he had elected to go to the hearing the State Department offered, such facts could have been brought out by cross-examination or by a deposition in the judicial proceeding. However, his passport was not revoked solely because he might have intended to go to Iran, but because his world-wide activities had caused, were causing, and were likely to cause serious damage to the national security and foreign policy of the United States throughout the world, including Iran. (App. 13)

69. 18 U.S.C. § 953 provides:
§ 953. Private correspondence with foreign governments
Any citizen of the United States, wherever he may be, who, without authority of the United States, directly or indirectly commences or carries on any correspondence or intercourse with any foreign government or any officer or agent thereof, with intent to influence the measures or conduct of any foreign government or of any officer or agent thereof, in relation to any disputes or controversies with the United States, or to defeat the measures of the United States, shall be fined not more than $5,000 or imprisoned not more than three years, or both. . . . (62 Stat. 744)

70. *Unlawful Intercourse with Foreign Government (Logan Act)*
The Grand Jury charges:
From on or about the 4th day of November 1979 until on or about the 24th day of December, 1979, *(an Iranian)*, and *(an Iranian)*, and a large group of other Iranians whose names are to the Grand Jury unknown, hereinafter referred to as "Iranian Terrorists", constituted a "foreign government" as defined by 18 U.S.C. § 11, in that they were a faction and body of insurgents within Iran, a country recognized by the United States and with which country the United States was at peace; that during the aforesaid period Philip Agee, herein charged as the defendant, a citizen of the United States, then in the vicinity of Hamburg, Germany, did, without authority of the United States, directly and indirectly carry on correspondence and intercourse with the aforesaid body of insurgents

constituting a foreign government and with officers and agents thereof, with intent to influence the measures and conduct of said foreign government and of the officers and agents thereof in relation to disputes and controversies between said foreign government and the United States, and to defeat the measures of the United States in such disputes and controversies, in that within a few weeks before the 23rd day of December 1979, the said Philip Agee did, communicate, correspond, and have intercourse with the aforementioned Iranian Terrorists by counselling, and suggesting to them, in relation to their dispute and controversy with the United States that they could prevail in their unlawful demands on the United States by forcing the United States contrary to the authority thereof, by extortion, to deliver into the possession of the aforesaid Iranian Terrorists constituting said foreign government, certain United States property, to wit, all records of the Central Intelligence Agency of the United States (CIA) on CIA intelligence operations in Iran for the past 30 years, in return for the release by said Iranian Terrorists of upwards of 50 citizens of the United States who were duly accredited to the official staff of the United States Embassy in Tehran, Iran, and who were then being threatened with execution and being unlawfully held and confined within the United States Embassy at Tehran, Iran by force by said foreign government as hostages in its dispute and controversy with the United States; all in violation of 18 U.S.C. §§ 953, 11.

71. 18 U.S.C. § 2381 provides:
§ 2381. Treason
Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined not less than $10,000; and shall be incapable of holding any office under the United States. (62 Stat. 807)
The United States Constitution also provides in Article III, Section 3 as follows:
Section 3. Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Per-

Iranian terrorists constitute a militant faction. of insurgents in Iran.

Under the Constitution, treason has no territorial limitation and the crime may be committed by an American citizen living outside the United States. *Kawakita v. United States*, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952). Adhering to enemies of the United States likewise has no territorial limitation. The overt acts required for treason may be "small . . . minor, not crucial . . . insignificant . . . a casual and unimportant step . . . it may be an abortive attempt; . . . [it may be] minute . . . remote from the scene of action . . . It is the nature of the act that is important . . . [If the] acts would tend to give the enemy the 'heart and courage to go on with the war,'[72] . . . [that is sufficient for treason]." *Id.* at 738–39, 741–42, 72 S.Ct. at 963, citing *Cramer v. United States*, 325 U.S. 1, 28–29, 34, 65 S.Ct. 918, 931–932, 934, 89 L.Ed. 1441 (1944). The death sentence was upheld in *Kawakita*. It follows that a more rigorous standard of proof than is required for treason would *not* be required for a charge of "adhering to [the] enemy." What is proscribed is "adhering to the . . . enemies in their enmity."[73] This aptly describes Agee's adherence.

Here it is clear that Agee's exchange proposal to the Terrorists for obtaining the CIA records showed more than sympathy with the militants. When coupled with his counselled suggestions and offer to assist the militants subsequently in analyzing the CIA records they had acquired, and others that might be obtained through extortion, his offers would be taken by the militants as a clear indication of support and encouragement for their position from an American citizen. It would give the Terrorists "heart and courage" to continue holding the embassy and the hostages to the detriment of the interests of the United States and particularly to the rights of the hostages. It is plain that by such conduct Agee indicated his adherence to the enemies of the United States giving them aid and comfort.[74]

His offense in its long distance physical aspects, is similar to that of "Orphan Ann", who was possibly also "Tokyo Rose". During World War II she *broadcast* demoralizing propaganda from Japan to American troops in the Pacific and was convicted in the United States Courts under the treason statute for adhering to the enemy by her radio broadcasts. *D'Aquino v. United States*, 192 F.2d 338 (9th Cir. 1951), *cert.*, *denied*, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343 (1952). Agee adhered to the enemy by his proposals over the *telephone* in which he admits he suggested to the terrorists that they exchange the American hostages for the CIA's Iranian records.

*Charge to the Grand Jury*, 30 F.Cas. 1036, 1037 (C.C.Ohio 1861) (No. 18,272) declares: "This language [adhering to the enemies, etc.] leaves no room to doubt that treason may be predicated [on] acts which are not a direct levying of war according to the construction of that phrase . . . ."

*See United States v. Haupt*, 47 F.Supp. 836 (N.D.Ill.1942), *rev'd on other grounds*, 136

son shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the life of the Person attained.

**72.** Lord Chief Justice Treby, in *Trial of Captain Vaughan*, 13 How.St.Tr. 485, 533.

**73.** *Id.*

**74.** *Thompson v. Gleason*, 317 F.2d 901 (D.C. Cir. 1962), held that any act defined by Congress as a crime which does in fact render assistance to an enemy is sufficient to come within such terminology for purposes of forfeiting veterans benefits. The acts in question were articles written in opposition to the Korean War asserting, *inter alia*, that United States support of the United Nations in Korea constituted "armed intervention", "armed aggression" and "fiendish Lidicies perpetrated by American hands." *Id.* at 904. The Court held the determination must be made in the first instance by the Administrator of Veterans Affairs. Agee's acts here are of greater substance and more direct in assisting the militants than in *Thompson*.

F.2d 661 (1943).[75] However, the seizure and occupation of the American Embassy, the confinement of the Embassy staff of American citizens and holding them as hostages does constitute an *act* of war. See note 12, *supra*. A draft indictment is set forth below.[76]

(3) Kidnapping, 18 U.S.C. §§ 1201, 11, and 2. The Lindbergh Kidnapping statute, which originally required transportation of the victim in interstate or foreign commerce, has recently been amended. Transportation is no longer an essential element of the crime if the victim is "seized" or "confined" within the "special maritime or territorial jurisdiction of the United States."[77] Since the United States Embassy in Iran, under our federal criminal laws and decisions, is within the "special . .

territorial jurisdiction of the United States," and the kidnapping statute by its terms applies within such jurisdiction, the only question is as to the power of the United States to enforce its laws against individuals who violate United States laws in an American Embassy in foreign territory. *United States v. Erdos, supra*, in the Fourth Circuit decided that the federal manslaughter statute applied to an American citizen in the Embassy in Guinea. Here the Iranian citizens are clearly guilty of kidnapping. Regardless of what term may be applied to their acts, kidnapping is a crime in every civilized country.

Since it is an offense under our laws, applying the federal kidnapping statute to the territory comprising the compound of the United States Embassy in Tehran by

**75.** Haupt was retried and convicted again of treason. This conviction was affirmed in *United States v. Haupt*, 152 F.2d 771 (7th Cir. 1946), *aff'd, Haupt v. United States*, 330 U.S. 631, 67 S.Ct. 874, 91 L.Ed. 1145 (1947), *rehearing denied*, 331 U.S. 864, 67 S.Ct. 1195, 91 L.Ed. 1869.

**76.** *Violation of the Treason Statute*
The Grand Jury charges:
On or about the 4th day of November, 1979, a militant faction and body of insurgents in Iran constituting a foreign government under 18 U.S.C. § 11 were enemies of the United States (hereinafter "enemies"), and on said date said enemies by force and violence unlawfully seized and occupied the United States Embassy in Tehran, Iran and also unlawfully seized and confined against their will over 50 members of the duly accredited official staff of the said United States Embassy, and said enemies have continued to date hereof to be enemies of the United States, to unlawfully occupy the entire premises of the said United States Embassy and to threaten with trial and execution and to hold said staff members for reward and otherwise as hostages for their demand that, despite the absence of any extradition treaty, the United States extradite Mohammad Raza Pahlavi, the Ex-Shah to Iran, and that the aforesaid facts and conditions continued to exist between the 4th day of November, 1979 and the 15th day of April, 1980 and thereafter, and that during said period, Philip Agee, herein charged as the defendant, a citizen owing allegiance to the United States, did, in violation of 18 U.S.C. § 2381, within a few weeks before the 23rd day of December, 1979, adhere to the above described enemies of the United States and give them aid and comfort elsewhere than in the United States by counselling and propos-

ing in direct communications from West Germany to the aforementioned enemies of the United States in Iran that they force the United States contrary to the authority thereof, to deliver into their possession, in return for the release by said enemies of said hostages, certain property of the United States, to wit: all records of the Central Intelligence Agency of the United States (CIA) on CIA operations in Iran for the past 30 years; and that to effect the object of the above described violations of 18 U.S.C. § 2381, did and performed the following and other overt acts, to wit:
1. Within recent weeks prior to December 23, 1979 said Philip Agee proposed to the Iranian Government to "exchange . . . the CIA's files on its operations in Iran since 1959 for the captive Americans."
2. Within recent weeks prior to December 23, 1979 said Philip Agee proposed to the militants [the faction and body of insurgents] occupying the American Embassy in [Tehran] to "exchange . . . the CIA's files on its operations in Iran since 1959 for the captive Americans."

**77.** 18 U.S.C. § 1201 provides:
(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:
\* \* \* \* \* \*
(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;
\* \* \* \* \* \*
shall be punished by imprisonment for any term of years or for life.

virtue of an application of the "special . . territorial jurisdiction of the United States" is within the constitutional grant to Congress: "To define and punish . . . Offences against the law of Nations." U.S. Const. art. I, cl. 10. The constitutional framers intended by this provision to empower Congress to *"define"* as well as to "punish" offenses against the law of nations. 2 M. Farrand, *The Records of the Federal Convention of 1787* 315–16 (1937).

The militants "seized" and "confined" the 50 official staff members of the United States Embassy within the Embassy. This is a direct crime against the United States. Because the kidnappers are Iranians, and presently outside the reach of United States judicial process, the Iranians in question may never come within the reach of federal judicial power sufficiently for this nation to enforce the "special" territorial jurisdiction that Congress has decreed. However, if they did come within the reach of our judicial power it is most likely that United States courts would uphold their trial and conviction under the constitutional grant to Congress to "define" and "punish" crimes against the law of nations. U.S.Const. art. I, cl. 10.[78]

In *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922) Chief Justice Taft, in overruling a district court's decision upholding a demurrer to an indictment, remarked:

The necessary *locus*, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations.

260 U.S. at 97–98, 43 S.Ct. at 41.

In *Bowman* three United States citizens, *and a citizen of Great Britain then resident in Brazil*, were indicted in the United States District Court in the Southern District of New York for conspiring on the high seas, *and in Brazil* as charged in a separate count, to defraud a United States government corporation. The Supreme Court held that criminal statutes that proscribe acts that are directly injurious to the Government and are capable of perpetuation without regard to any particular locality are to be construed as applicable to citizens of the United States on the high seas *or in a foreign country*,[79] even though there is no express declaration to that effect. The Court also refused to dismiss the indictment against the British subject, even though he was never aboard the United States ship and his *locus was at all times* within the territorial limits of Brazil.

That international law would permit the United States to prosecute crimes against it

**78.** Newspapers on May 12, 1980 reported that the British Government would prosecute the sole surviving Iranian terrorist who held the Iranian diplomatic staff as hostages for a week in the Iranian Embassy in London. Nevertheless, the Iranian Government indicated, so the news story asserts, that it would seek to extradite the terrorist to Iran. This indicates that the Iranian Government also contends that it has special territorial jurisdiction over offenses by its nationals that are committed in its Embassy in a foreign country.

**79.** Cf. *United States v. Flores*, 289 U.S. 137, 155·58, 53 S.Ct. 580, 584–585, 77 L.Ed. 1086 (1933) which held that the United States law against murder on waters "within the admiralty and maritime jurisdiction of the United States" applied to an American citizen on board an American vessel attached to the shore by cable within the Belgian Congo at a point inland 250 miles from the mouth of the Congo River. The concurrent jurisdiction of the local government was recognized, but it was noted that such local jurisdiction was not "asserted" (as here), and that by comity among civilized nations where the offense affected only "the vessel or those helping them" the offense was to be dealt with by the authorities of the nation to which the vessel belonged. The opinion recognizes an exception where the offense disturbs the peace and tranquillity of the local country, but where as here, the local sovereign does not assert its law, it is submitted that comity, as recognized by the order of the International Court of Justice, *supra*, would recognize the declared concurrent jurisdiction of the nation directly offended. Under such circumstances there would be no internal force that could prevent the courts of the offended nation from applying their law to its citizens and others who violate its laws and come within the power of its courts to enforce its judgments. Of course, special maritime jurisdiction differs from special territorial jurisdiction.

because of the "morality and justice" involved was suggested by Justice Cardozo in *New Jersey v. Delaware*, 291 U.S. 361, 383–84, 54 S.Ct. 407, 414–415, 78 L.Ed. 847 (1934):

> International law, or the law that governs between states, has at times, like the common law within states, a twilight existence during which it is hardly distinguishable from morality or justice, till at length the *imprimatur* of a court attests its jural quality. Lauterpacht, *supra*, pp. 110, 255; Hall, *supra*, pp. 7, 12, 15, 16; Jenks, The New Jurisprudence, pp. 11, 12.

An American citizen (Agee) thus commits a criminal violation of United States laws when he "aids" and "counsels", 18 U.S.C. § 2(a), citizens of a foreign country, under the above circumstances, in their violation of our kidnapping statute on the premises of a United States Embassy where the United States has concurrent jurisdiction. Agee thus became a principal in such kidnapping when he *counselled* the terrorists in their kidnapping violations to demand United States property, i. e., the CIA records, in return for the release of their American captives. A draft indictment is set forth in the margin.[80]

(4) Seditious Conspiracy, 18 U.S.C. § 2384. This statute provides:

> "If two or more persons . . . in any place subject to the jurisdiction of the United States, conspire . . . by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined not more than \$20,000 or imprisoned not more than 20 years, or both."

Under the law applied in *United States v. Erdos, supra*, the American Embassy in Tehran is a place subject to the special territorial jurisdiction of the United States, 18 U.S.C. § 11. From the statement attributed to Agee it is clear that he conspired with the Iranian Terrorists who were on our Embassy premises to seize by extortion property of the United States, contrary to the authority thereof. The property that was the subject of the conspiracy consisted of Government records, i. e., CIA records covering 30 years of operations in Iran. Such conspiracy between Agee and the Terrorists existed within the "recent weeks" before the 23rd day of December, 1979. As stated above, Agee's statement concedes the facts that constitute this offense (App. 94), i. e., that he counselled the "militants" to demand the CIA operational records on Iran. A draft indictment is set forth in the margin.[81]

---

**80.** *Kidnapping*

The Grand Jury charges:

On or about the 4th day of November, 1979, and continuing until the date of this indictment at the compound of the United States Embassy in Iran situated on lands in the City of Tehran, acquired for the use of the United States and under the concurrent jurisdiction thereof, a place within the statutorily defined special maritime and territorial jurisdiction of the United States, (*name of Iran Terrorist*) and (*name of Iranian Terrorist*) and numerous other persons to the Grand Jury unknown, composed a group of Iranian Terrorists, constituting a militant faction and body of insurgents in Iran, herein charged as defendants, did, by force and violence unlawfully occupy the said United States Embassy and seize and confine and hold therein for reward and otherwise as hostages to their unlawful demands to extradite the Ex-Shah of Iran from the United States to Iran, despite the non-existence of any extradition treaty between the two nations, over 50 citizens of the United States duly accredited to the official staff of the United States Embassy in Tehran, Iran, in violation of 18 U.S.C. §§ 1201 and 11; and during said period of time Philip Agee, a citizen of the United States, also a defendant herein, did aid, abet and counsel said defendants in their commission of said crimes against the laws of the United States by counselling and proposing that they force the United States contrary to the authority thereof, to deliver into the possession of said Iranian Terrorists, in return for their release of said hostages, certain property of the United States, to wit, all records of the Central Intelligence Agency of the United States (CIA) on CIA operations in Iran for the past 30 years; in violation of 18 U.S.C. §§ 1201, 11 and 2.

**81.** *Seditious Conspiracy to Commit Extortion*

The Grand Jury charges:

Within the recent weeks before the 23rd day of December, 1979, and thereafter, in a place subject to the jurisdiction of the United States, to wit, the lands acquired for the use of the United States Embassy in Tehran, Iran, which lands are under the concurrent jurisdiction of the United States, Philip Agee, an American citizen and the defendant herein did, with nu-

merous unindicted co-conspirators then present in Tehran, Iran, whose names are to the Grand Jury unknown, hereinafter referred to as "Iranian Terrorists," unlawfully, knowingly and willfully conspire together to commit certain offenses against the United States, in violation of the provisions of Sections 2384 and 2 of Title 18, United States Code; in that said Philip Agee and said unindicted coconspirators did conspire by force to seize, take and possess property of the United States contrary to the authority thereof, i. e., property consisting of records for the past 30 years of the intelligence operations in Iran of the Central Intelligence Agency of the United States, hereinafter referred to as the "CIA", and during the course of the said conspiracy Philip Agee, did aid, abet and counsel the said Iranian Terrorists within the premises of the aforesaid United States Embassy in the unlawful conspiracy described above; and that to effect the object of the above described unlawful conspiracy, the defendants during the course of the aforesaid conspiracy, did and performed the following and other overt acts, to wit:

OVERT ACTS

(1) Within a few weeks before the 23rd day of December, 1979, Philip Agee had a telephone conversation with the aforementioned militant Iranian Terrorists.

(2) Within a few weeks before the 23rd day of December, Philip Agee counselled the said Iranian Terrorists within the United States Embassy in Tehran, Iran and proposed that some of their illegal objectives could be achieved by forcing the United States of America, contrary to the authority thereof, to deliver into the possession of the Iranian Terrorists certain property of the United States, to wit, all CIA records on CIA intelligence operations in Iran for the past 30 years, in return for the release by said Iranian Terrorists of the aforementioned American citizens held as hostages.

(3) The said Iranian Terrorists continued illegally to occupy the premises of the United States Embassy in Tehran, Iran.

(4) The said Iranian Terrorists within the premises of the United States Embassy in Tehran continued to confine by force and violence and against their will in excess of 50 citizens of the United States, all members of the official staff of the United States Embassy in Iran.

(5) The said Iranian Terrorists continued to confine as hostages the same 50 United States citizens and did threaten, and continue to threaten, their trial and execution.